[618 NYS2d 298]

In the Matter of WILLIAM F. WALLACE et al., as Trustees, under a Declaration of Trust Dated December 30, 1955, Respondents, v 600 PARTNERS Co., Appellant.

First Department, November 10, 1994

## APPEARANCES OF COUNSEL

*Philip H. Schaeffer* of counsel *(John S. Willems* and *Cyrus Benson, III* with him on the brief; *White & Case,* attorneys), for appellant.

*Richard C. Seltzer* of counsel *(Naomi B. Waltman* with him on the brief; *Kaye, Scholer, Fierman, Hays & Handler,* attorneys), for respondents.

## OPINION OF THE COURT

Tom, J.

Petitioners-respondents landlords William F. Wallace and Marie Powers (the Landlords) are trustees pursuant to a Declaration of Trust dated December 30, 1955 and own the fee between 57th and 58th Streets on the westerly side of Madison Avenue, New York, New York (designated as 600 Madison Avenue [the Premises]). Respondent-appellant 600 Partners Co. (Tenant) is a New York limited partnership which leased the Premises pursuant to a ground lease (the Lease) executed in July 1960.

The Lease provides a total possible term of 99 years, with an initial 33-year term running from July 1, 1960 through

June 30, 1993 and two subsequent renewal options of 33 years (the renewal terms). After entering into the Lease, the Tenant constructed a high-rise office building on the leased property.

During the initial 33-year term, the Lease provided for six rent escalations with a starting rent of $100,000 in 1960 and five increments leading to a rent of $160,000 in 1985. For the final eight years of the initial term, the Lease provided that if the parties could not agree on a new rental rate, an appraisal would take place and the rent would be set at 6% of the "then value" of the land. The foregoing procedure was invoked by the parties in 1985 and an annual rent of $2,100,000 was established.

As to the renewal terms, section 16.01 of the Lease provides that if the parties could not agree on the rent for the first renewal term, an appraisal would be utilized to set the rent at 6% of the "then value" of the land pursuant to article 17 of the Lease.

Prior to the end of the first term, the Tenant timely exercised its option to renew the Lease and, since the parties could not agree on a rental rate, the Tenant formally demanded an appraisal on March 29, 1993. The Landlords refused to proceed with the appraisal and commenced the underlying proceeding pursuant to CPLR 7601 seeking a judgment staying said appraisal on the grounds that it was premature and was not to be held until the year 2025 pursuant to the express terms of article 17 of the Lease. The Tenant cross-moved to dismiss the petition.

The dispute arises out of section 17.01 of the Lease which provides, *inter alia:* "The party desiring * * * appraisal shall give written notice to that effect to the other party * * * except that in case of any appraisal under the provisions of Sections 16.01 or 16.02 hereof with respect to the first renewal term and the second renewal term, neither party shall give such written notice to the other party earlier than twelve (12) months *prior to the expiration of any such renewal term."* (Emphasis added.)

The Tenant asserted, *inter alia,* that: the use of the word "expiration" was a scrivener's error which the drafters intended to mean "commencement"; and that a literal interpretation of the Lease would be contrary to, and inconsistent with, the entire scheme of the Lease as well as the true intentions of the parties.

Justice Burton Sherman, by memorandum decision dated

April 11, 1993, and order and judgment entered October 7, 1993, granted the petition, denied the Tenant's cross motion and stayed the appraisal as per the terms of the Lease. This appeal ensued.

■ In the first instance, the IAS Court correctly found, and the Tenant does not now dispute, that insofar as the Tenant seeks reformation of the Lease, that cause of action is barred by the Statute of Limitations. An action for reformation is governed by a six-year Statute of Limitations which accrues at the time of the alleged scrivener's error (CPLR 213 [6]; *Lopata v Lopata,* 196 AD2d 741, *lv denied* 82 NY2d 662; *Burke Sec. v National Union Fire Ins. Co.,* 184 AD2d 1046; *Ta Chun Wang v Chun Wong,* 163 AD2d 300, *lv denied* 77 NY2d 804, *cert denied* 501 US 1252).

In the case at bar, approximately 33 years have passed between the alleged scrivener's error and the commencement of the underlying proceeding.

On appeal, the Tenant argues that the court has the inherent power to correct a scrivener's error in the absence of a claim for reformation when such construction is contrary to the parties' manifest intention or creates an absurdity, and that such judicial interpretation is not barred by the Statute of Limitations. The Tenant maintains that if section 17.01 is enforced as written, requiring the appraisal to be held at the end of the first renewal term, the result would create internal contradictions and inconsistencies in the Lease.

In *Matter of Cale Dev. Co. v Conciliation & Appeals Bd.* (94 AD2d 229, 234, *affd* 61 NY2d 976), we held that: "Lease interpretation is subject to the same rules of construction as are applicable to other agreements. *(Backer Mgt. Corp. v Acme Quilting Co.,* 46 NY2d 211, 217.) The parties' intention should be determined from the language employed, and where the language is clear and unambiguous, interpretation is a matter of law to be determined solely by the court. *(Hartford Acc. & Indem. Co. v Wesolowski,* 33 NY2d 169, 171-172; *Bethlehem Steel Co. v Turner Constr. Co.,* 2 NY2d 456.) In such circumstances resort cannot be had to extrinsic evidence to contradict the express terms of the writing. *(Brainard v New York Cent. R. R. Co.,* 242 NY 125.)" *(See also, Louis R. Morandi, P. C. v Charter Mgt. Co.,* 159 AD2d 422.)

A contract must be interpreted in conjunction with the intent of the parties, and where the intention is unequivocally set forth in the agreement, the intent must be guided by the

language used *(Breed v Insurance Co.,* 46 NY2d 351; *Quest Equities Corp. v Benson,* 193 AD2d 508).

Section 17.01 explicitly provides separate guidelines for the timing of appraisals for both the original term and the renewal terms of the Lease. With regard to the original term, an appraisal is to be scheduled when the parties cannot agree on the rent, which, if applied to a renewal term, would occur at the beginning of such term. However, the Lease, in a separate and distinct provision, supplies a different timing mechanism for the renewal terms; to wit, that the notice of appraisal for the renewal period is not to be served earlier than 12 months prior to the "expiration" for such term.

There would be no need for two separate timing provisions in the Lease if Tenant's reasoning that the appraisal should occur at the beginning of the renewal term was correct. Since it is a "cardinal rule of construction" that the court adopt an interpretation that renders no portion of the contract meaningless *(Corhill Corp. v S. D. Plants, Inc.,* 9 NY2d 595, 599; *Fleischman v Furgueson,* 223 NY 235, 239), the Tenant's argument must be rejected.

In addition, the Lease agreement was negotiated and drafted by experienced businessmen represented by counsel. The record further reflects that the Lease, including the provision in question, was reviewed and revised by the parties a number of times. In a 1964 amendment, the right of a leasehold mortgagee to notice of an appraisal was recognized and such right was incorporated into the Lease. The new language was inserted in the sentence in question and just before the words "twelve (12) months prior to the expiration of any such renewal term." Clearly, if there was an obvious, crucial error in the amended sentence, such mistake would have been detected and corrected. At no point was the word "expiration" changed, or questioned, from the time it was included in the original draft.

Courts should not, under the guise of interpretation, rewrite part of an agreement which is clear and explicit simply because a party's expectation of the bargain does not materialize due to a change in economic climate *(see, North Fork Bank & Trust Co. v Romet Corp.,* 192 AD2d 591, 592; *Morlee Sales Corp. v Manufacturers Trust Co.,* 9 NY2d 16, 19; *Slamow v Del Col,* 174 AD2d 725, 726, *affd* 79 NY2d 1016).

The Tenant asserts that by postponing the appraisal until 2025, as required by a literal reading of article 17, the Lease

becomes both unassignable and unfinanceable. The Tenant contends that "the inability of a lender to know what the net annual rent will be during the renewal terms of the [Lease] manifestly makes it impossible for that lender to value the lease and therefore determine how much it can lend on the strength thereof."

However, if the language was in any way offensive to the parties, or the leasehold mortgagee, it should have been raised at the time of the amendment of article 17. The language was acceptable to the mortgagee and all parties at the time of the amendment. Indeed, the foregoing goes to the Tenant's subsequent argument that a physical examination of article 17 reveals numerous type-ins, strikeouts and misspellings, making it more likely that the use of the word "expiration" was a scrivener's error.

Our view, however, is that because article 17 was clearly negotiated, revised and edited on a number of occasions (it was apparently confirmed by the parties three times between 1960 and 1964) it is, in fact, much more likely that the word "expiration" was not in error and was intentionally left in the Lease. It is well settled that where a written agreement between sophisticated, counseled businessmen dealing at arm's length is unambiguous on its face, one party cannot defeat summary judgment by a conclusory assertion that, owing to mutual mistake, the writing did not express his or her understanding of the agreement (see, *Chimart Assocs. v Paul,* 66 NY2d 570, 571; *South Fork Broadcasting Corp. v Fenton,* 141 AD2d 312, 314).

The Tenant also argues that the Lease provides no guidance for retrospective valuation of the Premises and that such valuation is unprecedented. We disagree.

In the first instance, if the rent was to remain unchanged for the entire 33-year renewal period pursuant to an appraisal conducted at the beginning of the period, which is what the Tenant proposes, it would not only be in contravention of the express language of section 17.01, but it would also be inconsistent with the conduct of the parties over the initial 33-year period, in which the Lease provided for five step-ups in rent and an appraisal to determine the remaining eight-year rental rate at the end of the term. Petitioners maintain, logically, that it would be inconceivable for the Landlords to agree on a fixed rent for the next 33 years of the renewal term without a single increase. The enforcement of the plain language of

article 17, utilizing a retrospective appraisal, would most probably lead to escalating rents over the first renewal term, rather than one rental rate throughout.

It is also clear that the Tenant's characterization of retrospective valuation as "unprecedented" is, simply, not the case in that such valuation has been utilized in real estate and other business practices (see, e.g., Uniform Standards of Professional Appraisal Practice [1992]).

The Tenant's contention that section 17.01 is inconsistent with other provisions of the Lease is likewise unavailing. Section 16.03 of the Lease states, in pertinent part: "If at the commencement date of any renewal term the amount of the net annual rental payable during such renewal term under this Article 16 shall not have been determined, then until such determination the Tenant shall continue to pay the net annual rental * * * at the rate payable immediately prior to the commencement of such renewal term, provided that within fifteen (15) days after the determination by the appraisers * * * the Tenant shall pay to the Landlord the difference * * * between the rent theretofore paid * * * and the rent as fixed by appraisal."

The Tenant asserts that the word "determine" as used above means determined by appraisal and that the drafters, in using the word "[i]f", contemplated that the appraisal would be completed prior to the commencement date of the renewal period.

In regarding the Tenant's strained interpretation, there is no evidence that the word determination is limited to determination by appraisal, as the parties clearly could have reached an agreement on the rent on their own accord. It is incumbent on the court, when interpreting a contract, to give the words and phrases contained therein their ordinary, plain meaning (see, American Express Bank v Uniroyal, Inc., 164 AD2d 275, 277; Mazzola v County of Suffolk, 143 AD2d 734, 735). Further, the latter portion of section 16.03 provides guidance as to how the Tenant shall retrospectively pay the Landlords once the appraisal is conducted, indicating that the appraisal would take place after the commencement of the renewal period.

Since the language employed is clear and unambiguous and not inconsistent with the balance of the Lease, extrinsic evidence may not be utilized to contradict the express terms of the agreement. Even assuming that parol evidence is admissible, the Tenant's evidence, which consists of affidavits from its

attorneys and appraisers, failed to raise factual issues to warrant a hearing. No affidavit was submitted from the original parties or attorneys who negotiated and drafted the Lease agreement.

We have reviewed the Tenant's remaining arguments and consider them to be without merit.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Burton Sherman, J.), entered October 7, 1993, which granted the petition and denied respondent's cross motion, is affirmed.

Asch, J. (concurring). I agree with the majority opinion affirming the judgment of the Supreme Court. I write simply to respond to the assertion in the dissent that the provision with respect to the time set for the appraisal is "at odds with normal business practice".

The Lease, herein, expressly provided five step-ups in rent for the first 25 years of the original 33-year term. For the last eight years of the original 33-year term, the parties provided that the Lease would be renegotiated or set by appraisal in 1985 to reflect current market rates. If the annual rent for the first renewal term is frozen for the next 33 years by an appraisal fixing the land value in 1993, it would disregard the express language of the Lease and the conduct of the parties over the first 33-year term.

By providing for an appraisal one year prior to the expiration of the renewal term, the parties have inserted a provision which will reflect the changing values over the term. Such clauses which provide for payments retrospectively are commonplace in business, and may, indeed, be fairer to the parties. As an example, many commercial insurance policies calculate premiums due at the *expiration* of the policy period, taking account of claims and expenses during the period.

Ellerin, J. (dissenting). The within proceeding was brought pursuant to CPLR 7601 to stay a real estate appraisal which had been demanded by respondent pursuant to a ground lease as to which respondent is petitioners' Tenant. Petitioners argue that the Lease does not provide for an appraisal in order to set the prospective rent for a renewal term at this time, i.e., the commencement of the term, but, instead, provides that the appraisal should be performed at the end of the term and the rent set retroactively.

CPLR 7601 provides, *inter alia,* for a special proceeding to

specifically enforce an agreement involving questions of valuation or appraisal. A court presented with a petition pursuant to this section must examine the contractual language relating to appraisal and determine the rights of the parties pursuant to that language. As is always the case in contractual interpretation, it is incumbent upon the court to determine whether a given contractual provision is so ambiguous, or its result so absurd, as to warrant going outside the language of the agreement itself to determine the intent of the parties (4 Williston, Contracts § 610B, at 533 [3d ed 1961]). Once it is determined that interpretation is required, the court is permitted, if warranted by a factual finding that a certain provision was the result of a scrivener's error, to substitute a new term for the term actually provided in the contract *(see, Castelli v Burns,* 156 App Div 200).

In this case, the contract provides that, until the rent for the renewal term is determined, the Tenant will continue to pay the rent set for the prior term. If the parties are unable to agree to an appropriate rental for the renewal term, which will in no case be less than that for the prior term, they are thereby relegated to determining the rent by appraisal, and "[t]he party desiring such * * * appraisal shall give written notice to that effect to the other party * * * except that in the case of any appraisal * * * with respect to the first renewal term and the second renewal term, neither party shall give such written notice to the other party earlier than twelve (12) months prior to the *expiration* of any such renewal term" (emphasis supplied).

This contractual provision, if read literally, would result in a number of anomalies. First, it would mean that Tenant was unable to know its annual rent until the expiration of the 33-year term during which it is due and would thereby make the Lease worthless as collateral for mortgage financing. Moreover, this provision leaves Landlord with no security for the lump-sum payment due at the expiration of the Lease for the retroactive rental and provides for no interest payment on the deferred portion of the rent. Furthermore, as written, the Lease leaves undefined the point in time at which the land's value should be ascertained. The only reference to this is made in a separate provision stating that the yearly rent shall be set according to a percentage of the "then value" of the land as fixed by the appraisal. If the appraisal is to be performed at the end of the term, this could be interpreted to mean either, as the IAS Court assumed, that the land's value

must be retroactively appraised separately for each individual year over the course of the term, or to mean that the rent for the entire term should be computed as a percentage of the value of the land at the end of the term.

Additionally, the Tenant's inability to know its actual rent until years after the year to which the rent is attributable means it is without the information necessary to determine the amounts it must charge to its own tenants, and unable to determine whether it is operating at a profit or a loss.

Since, as a result, this provision is so at odds with normal business practice as to render its meaning unclear (see, McCarthy v Krebs Pigment & Chem. Co., 204 App Div 501), the court should consider parol evidence to determine the intent of the parties and whether the use of the word "expiration" was an error or expressed the parties' true intent. None of the parol evidence presented by the parties to date sheds sufficient light on the intent of the parties at the time the Lease was entered into to warrant a finding in either party's favor as a matter of law, and I believe that a trial as to this issue appears necessary. However, the parties should first be given an opportunity to conduct discovery and, should such discovery reveal additional evidence of both parties' intent, petitioners should be afforded an opportunity to renew this petition.

Ross, J., concurs with Tom, J.; Asch, J., concurs in a separate opinion; Sullivan, J. P., and Ellerin, J., dissent in a separate opinion by Ellerin, J.

Order and judgment (one paper), Supreme Court, New York County, entered October 7, 1993, affirmed.