[633 NYS2d 288]

New York Overnight Partners, L. P., Appellant, v Joan Gordon et al., Respondents.

First Department, November 9, 1995

## APPEARANCES OF COUNSEL

*John G. Hutchinson* of counsel *(Sidley & Austin,* attorneys), for appellant.

*John A. Kornfeld* of counsel *(Jay Goldberg, P. C.,* attorneys), for respondents.

## OPINION OF THE COURT

TOM, J.

The issue raised in this appeal is whether the term "land", as utilized in a certain Ground Lease Agreement, includes the hotel and improvements situated on the site, for the purpose of setting rent for the renewal lease terms.

The Ground Lease Agreement in question (the Lease) was executed on or about December 30, 1963 between Massachusetts Mutual Life Insurance Company, as lessor, and Louis Berry and F.B.M. Manufacturing Company, as lessees, and concerned the premises designated as 112 Central Park South, New York, New York. The building located on the site was known at that time as the Navarro Hotel and is currently known as the Ritz-Carlton Hotel. Plaintiff and counterclaim defendant-appellant New York Overnight Partners, L. P. is the successor-in-interest to the original lessee and defendants and counterclaimants-respondents Joan Gordon, Alice S. Kandell and Donald Trump are the successors-in-interest to the original lessor.

The Lease provides for an initial term of 30 years with an annual rental rate of $78,000. Article VI of the Lease further provides that the lessee shall have the right to extend the Lease term for four successive 15-year periods at a rental based upon "the appraised value of the land [at the time of each renewal] but to be not less than Seventy Eight Thousand ($78,000) Dollars annually".

Plaintiff asserts in its complaint that in October 1993, or three months prior to the expiration of the Lease, representatives of the parties to the Agreement commenced negotiations in an attempt to agree on the "appraised value" of the land

and to set an appropriate rental amount for the first renewal term. It was, and is, plaintiff's position that the term "land" as used in the Lease refers to the vacant parcel of land, exclusive of the hotel and all other improvements, and subject to current governmental restrictions, including zoning regulations, as well as restrictions set forth in the Lease. Defendants, on the other hand, maintain that the land should be appraised free and clear of all encumbrances and restrictions contained in the Lease and free and clear of all governmental ordinances and zoning restrictions, but with the benefit of the fully constructed hotel and all other improvements on the site.

On or about July 27, 1994, plaintiff Overnight Partners commenced the underlying declaratory judgment action seeking, *inter alia,* a legal construction of the term "the appraised value of the land" as it is used in section 6.01 (b) and throughout the Lease for the purpose of fixing rent for the renewal terms. On or about September 23, 1994, defendants answered the amended complaint and interposed a counterclaim which seeks a declaratory judgment interpreting the phrase "the appraised value of the land".

The parties, who wished "to expedite the resolution of this dispute", entered into a Stipulation dated September 21, 1994 (the Stipulation)[1] pursuant to which plaintiff agreed to withdraw, without prejudice, its first, second, fourth and fifth causes of action, leaving the third cause of action, which sought declaratory relief with respect to the proper legal construction of the terms of the Lease. The parties further agreed that plaintiff would move, and defendants would cross-move, for summary judgment within a scheduled time frame and would refrain from instituting any appraisal or arbitration proceeding regarding the construction of the language of the Lease "pending the entry of a final judgment from which all rights of appeal, including an appeal to the Court of Appeals, have been exhausted or waived".

Consistent with the terms of the Stipulation, the summary judgment motions were filed, with plaintiff relying exclusively on the language of the Lease and defendants also relying on other documentation, including an agreement entitled "Landlord Consent" prepared by plaintiff's counsel and executed by the parties on September 17, 1992.

---

1. The Stipulation was executed two days prior to defendants' filing of their answer and counterclaim, and stated "Defendants intend to answer the Plaintiff's First Amended Complaint and file a Counterclaim for declaratory relief regarding the meaning of the word 'land' ".

The IAS Court, in a handwritten, one-page decision entered March 21, 1995, denied plaintiff's motion, granted defendants' cross motion, and dismissed the complaint. The court, relying exclusively on a proposition set forth in a pre-Civil War Court of Appeals case decided in 1848, and failing to make any reference to the language of the Lease, wrote: "The plaintiff lessee contends that the word 'land' should be construed to mean only the raw or naked ground, and not to include the building constructed on that land, or any other improvements. The contrary has long been established. In 1848, in the first volume of official reports by the highest court of this state, it was held that unless defined to the contrary, 'land' includes not only the soil but everything attached by nature or man, including the trees and buildings. *Mott v Palmer*, 1 N. Y. 564, 572-3. That principle has constantly been restated. *Eg., City of New York v Mississippi Holding, Ltd.*, 126 Misc.2d 865, 866. Further, it is ridiculous to hold that the original lessor would have entered into the case upon the construction urged by the present plaintiff. Rather, the land should be appraised in view of the highest and best and most advantageous use to which it can be put."

The primary issue before us concerns the use of the word "land" as employed in section 6.01 (b) of the Lease. Section 6.01 (b) provides in pertinent part: "That each extended term shall be upon the same terms, covenants and conditions as in this lease provided, except that *the net annual basic rental for each fifteen (15) year extended term shall be at the rate of six and one-half (6$\frac{1}{2}$%) per cent of the appraised value of the land* but to be not less than Seventy Eight Thousand ($78,000) Dollars annually, payable in the manner and in accordance with the provisions of Section 3.01 of Article III hereof. Such appraised value is to be determined as of the date any such extended period commences." (Emphasis added.)

Plaintiff avers that the word "land" is unambiguously defined within the four corners of the Lease and, therefore, the IAS Court erred when it relied on a common-law definition of the word "land" which is directly at odds with the meaning of the word as employed in the Lease.

It is clear that lease interpretation is subject to the same rules of construction which are applicable to other agreements (*Backer Mgt. Corp. v Acme Quilting Co.*, 46 NY2d 211, 217; *Matter of Wallace v 600 Partners Co.*, 205 AD2d 202, 205; *Matter of Cale Dev. Co. v Conciliation & Appeals Bd.*, 94 AD2d 229, 234, *affd* 61 NY2d 976). As such, the parties' intention is to be

ascertained from the language employed and, absent ambiguity, interpretation is a matter of law to be determined solely by the court (*W.W.W. Assocs. v Giancontieri*, 77 NY2d 157, 162-163; *Chimart Assocs. v Paul*, 66 NY2d 570, 572; *Hartford Acc. & Indem. Co. v Wesolowski*, 33 NY2d 169, 171-172; *Louis R. Morandi, P. C. v Charter Mgt. Co.*, 159 AD2d 422, 423).

In *Mott v Palmer* (*supra*), the case upon which the IAS Court relied, the Court did not hold differently as it recognized that its definition of "land" would not be applicable had the parties to the deed agreed, in writing, that improvements would be excluded from the "land" in issue (*supra*, at 572-573; *see also*, *Kinkead v United States*, 150 US 483, 491).

 A review of the various provisions of the Lease supports plaintiff's position. Initially, it must be noted that the word "land" is not specifically defined in the "Definitions" section of the Lease. Section 1.04 of the Lease defines "Improvements" as:

"Any and all buildings being premises known and described as 112 Central Park South, sometimes also known as Navarro Hotel, New York, and the structures and improvements now or at any time hereafter erected, constructed or situated upon said premises or any part thereof. *The Improvements shall include such buildings, structures and improvements * * * that is to say, including all but the land. The above described structures and equipment are herein called 'Improvements'.*

"*EXCEPTING the land and Demised Premises hereinafter described in Article II, Section 2.01.*" (Emphasis added.)

Section 2.03 of the Lease makes it clear that the plaintiff lessee owns title to the Improvements and provides, in pertinent part: "The parties acknowledge that Lessee holds title to the Improvements *and has the right to maintain the Improvements on the Demised Premises* subject to the terms of this lease." (Emphasis added.)

 Thus, by its own terms, the Lease distinguishes the "Improvements", owned by the plaintiff, and the "Demised Premises" or "land", owned by the defendants. The Lease also provides a mechanism by which the ownership of the "Improvements" will be transferred to the defendants upon the termination of the Lease. Section 6A.01 (c) of the Lease states, in relevant part: "The Lessee covenants and agrees not to execute and deliver or release any new sublease to a sub-tenant which would extend beyond the terms of this lease, it being the intention of the parties that *the Lessor at the termination of this*

*lease shall be the sole owner of the Improvements as well as the land (Demised Premises)*, not subject to any lease". (Emphasis added.)

Again, it is clear from this section that "Improvements" and the "land" are separate and distinct, and that land is synonymous with "Demised Premises". "Demised Premises" is defined in section 1.03 of the Lease as follows: *The 'Demised Premises' shall mean the right, title and interest of Lessor* acquired by Lessor by deed of even date herewith, intended to be recorded contemporaneously herewith, *in the land described in Article II Section 2.01.*" (Emphasis added.)

Article II, section 2.01, entitled "Premises Demised-Term" states, in pertinent part:

"All that certain plot, piece or parcel of land, without the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

"Said Premises now being known as and by the Street Number 112 Central Park South (formerly 112 West 59th Street).

"Excepting therefrom:

"1. Any and all buildings, structures and improvements now or at any time hereafter erected, constructed or situated upon said land or any part thereof. The Improvements shall include such buildings, structures, and improvements and the foundations and footings thereof * * * *that is to say, including all but the land*, together with any and all renewals or replacements of buildings, structures or improvements or any of the above referred to property, being hereinafter sometimes collectively called the 'Improvements'." (Emphasis added.)

As set forth above, the right, title and interest acquired by the Lessor in the land *expressly excludes* any right, title or interest in the improvements on that land, as the Lessor will not acquire any such rights for up to an additional 60 years. Indeed, the only term in the Lease which can be construed to encompass both the land and the improvements is the term "Property" which is defined in section 1.05 of the Lease to mean "the Demised Premises and the Improvements * * * collectively."

It is also noteworthy that the terms "land" and "Improvements" are used to the exclusion of each other throughout the Lease; that the term "Property", not "land", is used to describe the "Improvements" together with the "Demised Premises";

and that the phrase "Demised Premises" is used synonymously (*see, e.g.*, § 6A.01 [c], *op. cit.)* with the term land. The foregoing, read together with the above-quoted provisions, makes it clear that the term land, as demised to the lessee, and as referenced in the phrase "appraised value of the land" ( 6.01 [b]), alludes, as it does throughout the Lease, to the raw land absent any improvements. Had the drafters intended to include the improvements, by their own definition, the term "Property" would have been used instead of "land". The drafters did not do so.

The IAS Court's reliance on *Mott v Palmer (supra)* is misplaced for a number of reasons. In the first instance, as we previously noted, the Court in *Mott* expressly held that the improvements will not be considered part of the land as long as "the reservation be in writing" (*supra*, at 570). Indeed, neither *Mott*, nor any other authority, establishes a universally applied common-law meaning for the word "land" that supersedes the parties' intentions and the language employed in the Lease.

The law is well settled that clear and unambiguous terms in a lease should be interpreted in their plain, ordinary and nontechnical sense and circumstances extrinsic to the agreement should not be considered when the intention of the parties can be ascertained from the four corners of the instrument (*United States Fid. & Guar. Co. v Annunziata*, 67 NY2d 229, 232; *Marine Midland Leasing Corp. v Chautauqua Airlines*, 175 AD2d 643, 644-645; *see also, Rosenfeld v Aaron*, 248 NY 437 [where the Court of Appeals, adopting the rule set forth in *Anzolone v Paskusz* (96 App Div 188), held that the parties to a lease may expressly attach a certain meaning to a term which, then, overrides the technical, common-law meaning of the word]). In the matter at bar, the parties clearly manifested their intent in the Lease that the word "land" was not intended to encompass the "Improvements".

Secondly, and to the extent that a definition of "land" could be found at common law, then *Macmillan, Inc. v CF Lex Assocs.* (56 NY2d 386), a case decided approximately 134 years after *Mott (supra)*, is superseding. In *Macmillan*, the Court of Appeals, in construing the phrase "tract of land" in the New York City Zoning Resolution, held: "We conclude that the phrase 'tract of land' refers only to the underlying surface land and does not embrace buildings on that land. After remarking that the phrase 'tract of land' is not defined in the zoning resolution, we base our conclusion on several convergent

considerations. In the first place, the denotation of the word 'tract' is 'a region or stretch (as of land) that is usu. indefinitely described or without precise boundaries', or 'a precisely defined or definable area of land' (Webster's Third New International Dictionary) and *the word 'land' means 'the solid part of the surface of the earth in contrast to the water of oceans and seas' (id.). Neither alone nor in combination do these words in their lexigraphic sense connote buildings or improvements. Moreover it is significant that the draftsmen of the resolution chose not to use the familiar and readily available 'land and improvements'*. Second, as used elsewhere in the zoning resolution we find nothing to suggest that a broader connotation was intended to be attached to the phrase." (*Supra*, at 391-392 [emphasis added]; *see also*, Marcus, *Air Rights in New York City: TDR, Zoning Lot Merger and the Well-Considered Plan*, 50 Bklyn L Rev 867, 907.) Accordingly, and contrary to defendants' argument, the land does not include the improvements.

Lastly, the holding in *Mott (supra)* was expressly limited to conveyances of real property by deed and has no application to the within Lease. In *Mott*, the Court was concerned with a fence which was affixed to the raw land when the deed was drawn, but was removed at approximately the time the buyer took possession of the land. The Court held: "The word land, *when used in a deed*, includes not only the naked earth, but every thing within it, and the buildings, trees, fixtures and fences upon it. * * * *A deed* passes all the incidents to the land as well as the land itself * * *. Fixtures belongings to the owner of the land, being part of the land, cannot be reserved by parol when the land is conveyed; the deed conveys them to the grantee unless the reservation be in writing." (*Mott v Palmer, supra*, at 569-570 [emphasis added].)

The Court continued, however, that where the land is subject to a leasehold estate, "[b]uildings and fixtures erected by a tenant for the purposes of trade belong to him, and are removable without the consent of his landlord". (*Supra*, at 570.) In view of all of the foregoing, we find that the IAS Court's reliance on *Mott v Palmer (supra)* was misplaced.

■ It is also worthy of note that since the plaintiff is the sole owner of the "Improvements" during the duration of the Lease, as provided by the Lease, and since defendants acquired a deed only to the land, it then follows that plaintiff should pay rent for the value of the land only and not for the improvements which it owns.

■ Defendants' reliance on a Stipulation executed by the parties on or about September 17, 1992 concerning the value of

renovations to the hotel in calculating rent; and on their assertion that plaintiff is not entitled to summary judgment because it prevented defendants from obtaining certain information and documents from Hospitality Valuation Services, which previously conducted an appraisal of the Lease for a prior tenant, is without merit as these materials constitute extrinsic evidence that cannot be used to contradict the unambiguous terms of the Lease (*Brainard v New York Cent. R. R. Co.*, 242 NY 125, 133; *Teitelbaum Holdings v Gold*, 48 NY2d 51, 56; *Matter of Wallace v 600 Partners Co.*, *supra*, at 205; *Matter of Cale Dev. Co. v Conciliation & Appeals Bd.*, *supra*, at 234).

Accordingly, we find that pursuant to the clear and unambiguous terms of the Lease, that the "appraised value of the land" may be determined only by reference to the raw land designated as 112 Central Park South, exclusive of the building and all "Improvements".

As part of its motion for summary judgment, plaintiff also sought a declaration that subsequent appraisal proceedings would take into account limitations regarding potential uses of the land as proscribed by the provisions of the Lease, as well as any applicable legislative, administrative and regulatory restrictions, not limited to zoning regulations. The IAS Court, while not expressly ruling on this issue, stated that "the land should be appraised in view of the highest and best and most advantageous use to which it can be put." Thus, it appears that the IAS Court concluded that it would permit an appraisal of the land that takes into account the right to continue the present nonconforming use, as the present structure was built prior to current zoning laws, which would increase the appraised value.[2] We disagree.

■ While we agree that the value of the land should be appraised for the best, most advantageous use that it can be put to (*United Equities v Mardordic Realty Co.*, 8 AD2d 398, 400, *affd* 7 NY2d 911; *Moore v Eadie*, 245 NY 166, 170), the fair market value must be determined by the terms of the Lease and restrictions or encumbrances, if any, affecting the land (*United Equities v Mardordic Realty Co.*, *supra*, at 400; *Plaza Hotel Assocs. v Wellington Assocs.*, 55 Misc 2d 483, 487, *affd* 28

---

2. The Ritz-Carlton Hotel, which is currently located on the Demised Premises, comprises approximately 152,000 gross square feet. Current ordinances, laws or regulations enacted pursuant to governmental authority would permit the construction of a new building of only approximately 82,500 gross square feet.

AD2d 1209, *affd* 22 NY2d 846; *see also, Kernochan v Manhattan Ry. Co.*, 161 NY 339, 349).

With regard to appraisals performed in situations similar to that found herein, it has been noted in a publication entitled The Appraisal of Real Estate (at 291-292 [10th ed]), commonly known as the "Appraiser's Handbook", that: "In most nonconforming use situations, the property value estimate reflects the non-conforming use. *Land value, however, is based on the legally permissible use, assuming the land is vacant.* The difference between the property value and the land value reflects the contribution of the existing improvements and possibly a bonus for the nonconforming use." (Emphasis added.)

Defendants' argument that vacant land must be appraised by giving effect to the nonconforming improvements on the land is without merit as it ignores the distinction between an appraisal of property (land plus the improvements) and the valuation of the raw land (absent the improvements and subject to the various encumbrances and restrictions found both in the Lease and government-enacted ordinances and regulations). As we have concluded above, the Lease requires the appraiser to determine the value of the raw land, not the property, hence the value of the land must be determined as though it were vacant, without improvements, and subject to current zoning restrictions and contractual limitations as well as the effect of the Lease itself on the value of the land.

Accordingly, the order of the Supreme Court, New York County (Richard Lowe, III, J.), which was entered on March 21, 1995, denying plaintiff's motion for summary judgment and granting defendants' cross motion for summary judgment on their counterclaim, is unanimously reversed, on the law, without costs, plaintiff's motion is granted and defendants' cross motion is denied.

KUPFERMAN, J. P., ASCH and WILLIAMS, JJ., concur.

Order, Supreme Court, New York County, entered March 21, 1995, reversed, on the law, without costs, plaintiff's motion for summary judgment granted and defendants' cross motion denied.