OPINION OF THE COURT
Debra Silber, J.
After trial on November 19, 2001 and November 27, 2001, *711 both sides represented by counsel, this commercial (no grounds) holdover action having been tried without a jury, the court finds that a holdover petition based solely upon allegations of commercial use, in light of the facts adduced at trial, must be dismissed. This proceeding is therefore dismissed with prejudice.
Findings of Fact
The undisputed facts are as follows. Respondent rented a rent-stabilized apartment on the third floor (3R) of the premises in 1994 from the petitioner, who has owned the building since 1989. The building comprises nine apartments and the storefront at issue. In 1998, in response to respondent’s inquiry, it was agreed between the parties that respondent would lease the vacant unit, which is a store on the certificate of occupancy, located on the ground floor. Maria Uriarte, the petitioner’s witness, testified that she is an officer of the corporation, prepares all the leases, collects the rent and does the corporation’s books. She testified that she prepared a residential, Blumberg form T327 lease, for rent-stabilized apartments, with a rider prepared by her which clearly contemplates residential use, commencing February 1, 1998, for the ground floor unit, which is identified on the lease as “storefront,” and which respondent refers to as unit 1L. Both parties signed the lease and respondent took occupancy of the space on February 1, 1998, simultaneously vacating apartment 3R. Not one word in the lease or rider thereto indicates that the space leased is commercial. In fact, the line where the apartment to be rented is to be described was left blank. Respondent moved her personal possessions down to the ground floor space, never paying rent for both places for the same period of time. Petitioner renewed the lease twice, for one year each. The latest renewal lease expired on January 31, 2001, after which this proceeding was commenced by service of a 30-day notice terminating “respondent’s month to month commercial tenancy.” Respondent’s exhibit A in evidence is a letter from Ms. Uriarte asking about the second renewal, which states therein, “if you want to renew you will be bound by the original lease terms” and “it shall be noted that you reside in the storefront as a live-in/work space area.”
Facts alleged which are subject to some dispute are as follows. Respondent claims she did not do any alterations to the premises, save installation of a wood counter in the kitchen area. At the time respondent entered into the first lease for the *712 storefront, the space had a refrigerator, stove, toilet and shower stall, along with one sink, which was near the stove. There was a dispute as to whether the bathroom was enclosed by walls and a door at the time of the lease, petitioner claiming not and respondent claiming that she made no changes. The petitioner employs a superintendent, who resides in an apartment on the ground floor at the premises, who testified that he has been employed by petitioner since prior to 1998, that he has lived at the premises since the 1980’s, that he has been in respondent’s unit several times, and that he was aware she was living in the space on the ground floor, although he wasn’t sure if she was living there since the first day of the lease in 1998. He testified that he saw her and her friends moving her property downstairs when she switched from 3R to 1L. He admitted that he would occasionally knock on her door at night to tell her she was parked on the wrong side of the street, and that a parking space was available should she want to move her vehicle. Respondent claims there was a verbal agreement with Ms. Uriarte that the lease for the storefront would be a rent-stabilized lease, that her rent was similar for the two spaces, that the size of the two spaces was similar, and that her rent security was applied to the lease for the new space, all indicating to her that she was exchanging one residential apartment for another. Respondent claims she was unaware that use of the space as a residence was prohibited by the certificate of occupancy. Respondent gave up an unequivocally rent-stabilized apartment in the building, which she testified was exactly the same size as the storefront (presumably with lower ceilings, but there was no testimony on this point). The court finds credible that respondent thought she had equivalent rights to renewal and rent regulation in the new space, as she was given a rent-stabilized lease. Ms. Uriarte claims there was never an intention on her part to offer a rent-stabilized lease to respondent, and that doing so, despite the existence of the lengthy rider concerning solely residential issues, was inadvertent, as she simply used the respondent’s prior lease, changing the rent and the dates. Respondent claims that the two prior tenants of 1L resided in the space, and that she knew them and had visited the space while they lived there, in the period between 1994 and 1998. The petitioner denies this, but provided no evidence to dispute respondent’s claims on this issue. Respondent claims she moved to the ground floor because that unit had more light, and because she wouldn’t have to carry her bicycle up the stairs. Ms. Uriarte testified that re *713 spondent moved downstairs so she wouldn’t have to carry wood upstairs, for whatever art or construction she did with the wood. The court finds the issue of the tenant’s motivation for moving irrelevant to the legal issues raised, as petitioner did not prove that respondent moved because she was going to use the store space for commercial purposes.
On or about March 5, 2001, respondent filed a complaint with the Division of Housing and Community Renewal (DHCR) that petitioner would not renew the rent-stabilized lease. Neither side testified as to any reason given by petitioner. On March 31, 2001, a 30-day termination notice, terminating the “commercial lease” was served on respondent. A notice of petition and petition followed, and the trial.
Conclusions of Law
Where there is a resident superintendent, said employee is an agent of the landlord and his knowledge is imputed to the landlord. If the first lease was indeed a mistake, it was renewed twice. Ms. Uriarte’s letter, sent in November 1999, evidences clear language indicating the landlord knew of the tenant’s residence in the premises. Combined with the superintendent’s knowledge that respondent was residing at the premises, the total lack of any commercial purpose indicated in the lease or in Ms. Arndt’s conduct once in possession, it cannot be argued that petitioner thought this was a commercial tenancy when this proceeding was begun.
It has been held that where a storefront was rented, that despite the commercial nature of the lease, where the landlord knew or acquiesced in the tenant’s residential use of the storefront, a commercial holdover proceeding was properly dismissed. (U.B.O. Realty Corp. v Mollica, 257 AD2d 460 [1st Dept 1999].) The Court in that case affirmed the Appellate Term, which had affirmed the Civil Court, and stated (at 460) “fw]e note the premises were already equipped for residential use when respondent moved in, the length and character of respondent’s residential tenancy, and the deletion from the last lease, at respondent’s request, of the phrase ‘and for no other purpose’ from the provision limiting use of the premises.” The court finds the facts analogous to those of the instant case, with the additional factor of the respondent herein having been given a residential lease, mandating dismissal of this proceeding.
This case is thus clearly distinguishable from the facts in 129 E. 56th St. Corp. v Harrison (122 Misc 2d 799 [App Term, 1st Dept 1984]), where the tenant moved into a commercial *714 storefront, signed a commercial lease, and subsequently bought a cot and a hotplate and claimed not only that he was a residential tenant, but that his residentially occupying the premises, by increasing the number of residential units to six, turned the entire property into a rent-stabilized building.
Petitioner’s counsel insisted at trial that the “error” in issuing the wrong form of lease should not bind the landlord to the terms thereof, that is, the right to renewal pursuant to the Rent Stabilization Law of 1969 (Administrative Code of City of NY, tit 26, ch 4) and Rent Stabilization Code (9 NYCRR parts 2520-2530) at a rental as set forth by the Rent Guidelines Board. While the issuance of a residential lease for a commercial space seemed novel to the court, happily there is case law to refer to. In Ruiz v Chwatt Assocs. (NYLJ, Aug. 20, 1997, at 21, col 4), an action in Supreme Court, New York County, for an alleged rent overcharge, involving a professional apartment on the ground floor of a large cooperative apartment building rented to a doctor, a residential lease was used, with a rider that restricted use to a medical office. The court concluded that the doctor was not given permission to move a bed in and live in what had been, for the former doctor tenant, an operating room, while using the rest as a medical office, stating:
“It is well settled that the interpretation of lease agreements is subject to the same laws applicable to other contracts George Backer Management Corp. v. Acme Quilting Co., Inc., 46 N.Y.2d 211 (1978), Cale Development Co., Inc. v. Conciliation and Appeals Board, 94 A.D.2d 229 (1st. Dept. 1983), New York Overnight Partners L.P. v. Gordon, 217 A.D.2d 20 (1st. Dept. 1995), Fox Paper Ltd. v. Schwartzman, 168 A.D.2d 604 (2nd Dept.). In the event that there is a conflict between two clauses within a contract, the handwritten or typewritten clauses prevail over the preprinted language of a form document. Kratzenstein v. Western Assurance Co., 116 N.Y. 54 (1889), Cale Development Co., Inc. v. Conciliation and Appeals Board, supra, 22 N.Y. Jur 2d, Contracts, §257. When the language is clear and unambiguous, the terms of the lease should be interpreted in the plain and ordinary sense that can be discerned from the four corners of the document. New York Overnight Partners L.P. v. Gordon, supra, Fox Paper Ltd. v. Schwartzman, supra.”
*715 The four corners of the lease admitted into evidence can only result in the conclusion that a residential lease was contemplated. Not only is no commercial use mentioned, no commercial use was discussed, no commercial activity was performed, and with a resident superintendent at the premises, the lease was renewed twice.
There were several cases cited by petitioner’s counsel for the proposition that the written lease, although residential, should be ignored, as the space is not residential. An evaluation of those cases follows. First, Mayflower Assoc. v Gray (NYLJ, Mar. 1, 1994, at 21, col 1 [App Term, 1st Dept]) is cited for the proposition that 9 NYCRR 2520.11 (n) provides that the Rent Stabilization Law shall not apply to “housing accommodations used exclusively for professional, commercial, or other nonresidential purposes,” and that “rent stabilization [c]overage * * * is governed by statute and * * * cannot be created * * * where the premises are exempted from regulation.” (Emphasis added.) Second, it has been held that the use of DHCR forms and riders in rent renewals is not dispositive evidence that the apartment is rent stabilized. Tendering rent renewal leases using rent-stabilization forms or riders does not extinguish the statutory exemption on exempt apartments. (Citing Park W. Vil. Assoc. v Leonard, NYLJ, Dec. 6, 1995, at 32, col 1 [App Term, 1st Dept]; Mayflower, supra [emphasis added].)
While seemingly on point, these cases can be distinguished by the fact that they involved apartments that were legal for residential use, but were exempted by specific action by the landlord, for reasons that are specifically permitted by the Rent Stabilization Law or Code for the exemption of legal apartments from the rent laws. In Park W. Vil. v Leonard, a tenant of a rent-stabilized unit decided to buy a bigger unit when the building was being converted to a condominium, and signed a contract of sale for the bigger unit, and an interim lease, which specifically stated that the lease was to be in effect until the closing, and that failure to purchase the unit would terminate the lease. The landlord inadvertently used a preprinted rent-stabilization form lease for the interim lease, but the rider was unambiguous. The Rent Stabilization Law exempted, at the time of this decision, by statute, coop and condo apartments.* The tenant purchaser failed to close and purchase the unit, and claimed that because there was a rent- *716 stabilization form lease, he was entitled to remain as a rent-stabilized tenant in the bigger unit despite his breach of the purchase agreement. The court, on these facts, in a residential holdover, held that the use of the form lease did not bind the landlord to keep the tenant in the larger (and previously vacant) condo unit as a rent-stabilized tenant, explaining (at 32, col 1) “[t]he parties clearly intended that [the] tenants forfeit the protections of the Rent Stabilization Law, following tenants’ voluntary relocation from their prior rent stabilized apartment * * * to the subject vacant apartment * * * which [the] tenants ultimately failed to purchase.” The consideration for the forfeiture of the protections of the Rent Stabilization Law, which is not discussed in the case, would have been an "insider” price for the larger unit, instead of a market price, something of real value. In Mayflower, the premises were a legal apartment in a multiple dwelling containing fewer than six dwelling units, and thus not subject to rent stabilization. The landlord used a form rent-stabilization lease, and when it expired, commenced a residential holdover, on the grounds that the lease expired and that the premises were not subject to rent stabilization. The Appellate Term found (at 21, col 2) that “[t]he use of rent stabilization forms or riders does not foreclose a claim, at the expiration of any given lease term, that the premises are exempt from or not subject to rent stabilization. Nor would the use of such instruments impose a contractual obligation to perpetuate a tenancy as stabilized where the statutory criteria for coverage are absent.”
In conclusion, in the above-described cases, cited by the landlord for the proposition that the respondent should be evicted in this commercial summary proceeding, the landlord rented a legal apartment to the tenant, not in violation of the certificate of occupancy, which apartment for statutory reasons was not covered by the Rent Stabilization Law and Code, and brought a residential holdover proceeding, wherein the landlord prevailed despite the use of a preprinted lease with rent-stabilization language. The landlords in these cases, it can be viewed, came to court with clean hands and a paperwork problem.
The statutory language of Multiple Dwelling Law §§301 and 302 provides various penalties to be visited on a landlord who rents a space not legal for dwelling in, and not in conformity with the certificate of occupancy, including: no rent shall be recovered by the owner; the mortgage may be declared due by the option of the mortgagee; and no summary proceeding shall *717 be maintained for rent or possession. There is an unambiguous implication that a property owner, who rents a unit to someone that is not legal (and presumably not safe) for habitation, has committed a wrong to the tenant and to society, and, for public policy reasons, should be punished. What greater punishment could be enacted by the Legislature than the forfeiture of rent from any occupancy period while the premises are illegally occupied. In the instant case, the court finds the landlord comes to court with unclean hands, and that the illegal use of the storefront for residential habitation requires the dismissal of this summary proceeding.
The court finds that there is no question that the petitioner knew the respondent would be living in the premises when it offered her the lease for the store in lieu of a renewal for unit 3R, and that if there was any confusion, which it stretches credulity to find, the lease was renewed twice, and that in the absence of a legal apartment in a residential proceeding with some “paperwork” problems which create legal issues requiring resolution by a court, the cases cited by petitioner have no place in this commercial holdover. Petitioner has no standing, by virtue of Multiple Dwelling Law § 302 to bring a summary proceeding to recover rent or possession.
In addition to the above analysis, for an equally sufficient ground for the dismissal of the proceeding, the court finds that the petition, in claiming that respondent’s commercial lease expired, was a misrepresentation that so infected the proceeding as to deprive the court of subject matter jurisdiction requiring dismissal of the petition. (MSG Pomp Corp. v Doe, 185 AD2d 798; Komar, Keyvan & ANC v Lipkin, NYLJ, Apr. 12, 1993, at 24, col 3 [Civ Ct, NY County].) The petition herein states “The premises is not subject to the NYC Rent and Rehabilitation Law and Regulations or Rent Stabilization Law and Code based on the fact the premises are used for commercial purposes: Storefront — Art Studio (Sculpturing, Painting and Carpentry).” Not only is there not one word in the lease about any commercial use, but there was not one word of testimony that respondent did any “sculpturing, painting or carpentry,” other than the super’s testimony that respondent had a saw and worktable in the premises when she lived on the third floor, that he saw the same in the ground floor space, but that they were gone by last spring. There was no evidence that respondent ever held the space out as a store, earned any money from whatever she was doing on her worktable, or that she ever was employed other than at her full-time job at a museum.
*718 The court specifically does not make a finding as to whether the storefront must be converted into a legal dwelling unit, whether an ejectment action would be proper, or whether a declaratory judgment action by the tenant would be found to have merit. Perhaps the outcome of the proceeding at DHCR will guide the parties. The court notes that there was no expert testimony proffered by either side as to what, if anything, would be required to amend the certificate of occupancy to convert the storefront to a residential unit.
While it can be argued that a tenant cannot be permitted to confer stabilized status upon himself, the case law is clear that such is the result if the landlord has knowledge of the residential use of a nonresidential space, allows the occupant to expend significant sums to convert the property into a residence and acquiesces or looks the other way, with knowledge of what is going on. In the case before me, the tenant did not do any renovations or alterations in order to reside in the premises, and received a rent-stabilized lease. Thus, while it cannot be argued that she was trying to create a rent-stabilized apartment, as she did nothing affirmative in that regard, in order to determine whether the unit should be legalized or respondent allowed to lease a unit comparable to her old unit, or whether respondent should be evicted, a balancing of the equities is required, which is beyond this court’s jurisdiction and with regard to which there was no evidence submitted at trial.

 Administrative Code § 26-504; Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4, as amended) § 5 (a) (4) (a) (McKinney’s Uncons Laws of NY § 8625 [a] [4] [a] [eff Aug. 8, 1991]).