[761 NYS2d 620]

VERMONT TEDDY BEAR CO., INC., Respondent, v 538 MADISON
REALTY COMPANY, Appellant.

First Department, June 3, 2003

APPEARANCES OF COUNSEL

*Andrew B. Messite* of counsel (*Reed Smith LLP*, attorneys), for respondent.

*James W. Perkins* and *Jay Goldberg* of counsel (*Greenberg Traurig LLP* and *Jay Goldberg, P.C.*, attorneys), for appellant.

**OPINION OF THE COURT**

SAXE, J.

The central issue on this appeal is the correct construction of the parties' commercial lease regarding their respective rights and obligations after a substantial casualty rendered the leased premises unusable. Its resolution requires consideration of competing rules of contract construction.

Defendant 538 Madison Realty Company owns the five-story building located at 538 Madison Avenue in midtown Manhattan. The Vermont Teddy Bear Co., Inc. was the tenant of the building's first-floor retail space under a 10-year lease agreement dated October 24, 1996. On December 7, 1997, a large portion of the southern facade of the adjacent building collapsed onto 538 Madison, causing substantial structural damage to 538 as well as a shutdown of the surrounding area. It is undisputed that the collapse rendered the leased premises unusable by the tenant.

Pursuant to article 9 of the lease, if the premises were rendered wholly unusable, the tenant's rent obligation would cease from that time forward, and would not resume until five days after written notice from the landlord that the premises were substantially ready for reoccupancy. Moreover, paragraph 3 of the rider to the lease gave the tenant, in these circumstances, the option to furnish the landlord with written notice of the tenant's election to terminate the lease if the premises were not restored within one year after the landlord's receipt of the notice.

On December 16, 1997, plaintiff wrote a letter to defendant's managing agent in which plaintiff, among other things, provided notice that, pursuant to paragraph 3 of the lease rider, it intended to terminate the lease if the premises were not restored within one year.

An initial question is raised by defendant as to whether this letter may even serve as the requisite predicate for termina-

tion, since it was not sent in accordance with the lease provisions concerning notice, which require that notice be sent by certified or registered mail to the landlord at a specified address as well as to designated counsel. However, defendant's failure to object promptly to the form or manner of delivery of plaintiff's notice, and, indeed, its response to the substance of the notice, demonstrates a waiver of the defect (*see Rower v West Chamson Corp.*, 210 AD2d 7 [1994]).

Having determined that plaintiff's notice was sufficient, the question is whether defendant's subsequent conduct successfully forestalled the contemplated termination in the manner required by the lease.*

In a January 19, 1998 letter, defendant's managing agent advised plaintiff's counsel, among other things, that repairs to the premises had begun and that the managing agent would notify plaintiff "as soon as the building is ready for occupancy."

Defendant relies upon the affidavit of its contractor, maintaining that plaintiff's ground floor space was actually restored as of July 7, 1998, less than seven months after the tenant's termination letter dated December 16, 1997. It concedes, however, that no formal notice of the restoration was sent. In support of its assertion that plaintiff was aware of the completed restoration in July 1998, defendant relies upon letters in which an officer of Vermont Teddy Bear stated the company's understanding that its obligation to pay rent would resume when the landlord's casualty insurance coverage for lost rent ran out. However, none of these letters even mentioned the undisputed contract term that the tenant's rent obligation would be reinstated only upon five days' written notice, nor did any of them mention the progress of the restoration work, referring only to the exhaustion of insurance benefits for lost rent.

Since it is undisputed that defendant landlord did not give the tenant written notification that the premises were restored, this appeal turns on whether the tenant's one-year notice of termination was averted by the actual restoration of the leased premises, *regardless* of whether the tenant was given notice of the restoration. Or, was it necessary, in order to avert the termination, to provide written notice to the tenant of the completed restoration of the premises?

The relevant language of lease rider paragraph 3 merely states that, once the tenant has given notice of its election to

---

* Since we are interpreting the terms of the lease as a matter of law, the particular circumstance of the tenant's desire to arrange for an assignment of the leasehold to a successor tenant is irrelevant on this point.

terminate, "[i]n the event the Premises are not restored within such one (1) year period the Lease shall be deemed terminated as of the end of the 12 [month] period and both Landlord and Tenant shall be released from all obligations which may arise after the Termination Date." The provision contains no explicit requirement of written notice of the completed restoration. The defendant suggests, and the dissent agrees, that this wording requires the conclusion that the act of restoration of the premises *is sufficient by itself* to successfully avert the termination of the lease, and that the absence of written notice to the tenant of the completed restoration is immaterial. Indeed, the dissent reasons that if the parties had intended to require written notice in order to avert the termination within one year, that requirement would have been set forth in the lease provision, when in fact, it was not. In short, the dissent would apply the rule that a term lacking from a contract may not be supplied by the courts under the guise of construction or interpretation (*see* 22 NY Jur 2d, Contracts § 218, at 260-261).

Indeed, if our examination were limited to the words contained in paragraph 3 of the lease rider, we would agree with the dissent's proposed interpretation. However, the parties' agreement must be read as a whole; one term should not be interpreted in a vacuum (*see Zodiac Enters. v American Broadcasting Cos.*, 81 AD2d 337, 339 [1981], *affd* 56 NY2d 738 [1982]; 22 NY Jur 2d, Contracts § 251, at 307). When viewed as such, it becomes clear that paragraph 3 of the lease rider arises out of, and relates to, article 9 of the original standard form lease. Both concern the parties' rights and obligations under the lease after a substantial casualty renders the leased premises unusable. Indeed, the two provisions are interrelated and should be read in conjunction. Consequently, the rule that a term lacking from a contract may not be supplied by the courts is inapplicable because the contract provision under consideration is interrelated with another provision, one which contains the term at issue, that is, the requirement of written notice of restoration by the landlord.

Article 9 is part of the standard form store lease issued by the Real Estate Board of New York, which was used and adapted by the parties; it sets out the parties' rights and obligations in the event that a casualty causes damage to the leased property. Subsections (c) and (d) of article 9 relate to the event that a casualty renders the premises wholly unusable, and they read in full as follows:

"(c) If the demised premises are totally damaged or

rendered wholly unusable by fire or other casualty, then the rent and other items of additional rent as hereinafter expressly provided shall be proportionately paid up to the time of the casualty and thenceforth *shall cease until the date when the premises shall have been repaired and restored by Owner* (or sooner reoccupied in part by Tenant then rent shall be apportioned as provided in subsection (b) above), subject to Owner's right to elect not to restore the same as hereinafter provided.

"(d) If the demised premises are rendered wholly unusable or (whether or not the demised premises are damaged in whole or in part) if the building shall be so damaged that Owner shall decide to demolish it or to rebuild it, then, in any of such events, Owner may elect to terminate this lease by written notice to Tenant given within 90 days after such fire or casualty or 30 days after adjustment of the insurance claim for such fire or casualty, whichever is sooner specifying a date for the expiration of the lease, which date shall not be more than 60 days after the giving of such notice, and upon the date specified in such notice the term of this lease shall expire as fully and completely as if such date were the date set forth above for the termination of this lease and Tenant shall forthwith quit, surrender and vacate the premises without prejudice however, to Owner's rights and remedies against Tenant under the lease provisions in effect prior to such termination, and any rent owing shall be paid up to such date and any payments of rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant. Unless Owner shall serve a termination notice as provided for herein, Owner shall make the repairs and restorations under the conditions of (b) and (c) hereof, with all reasonable expedition subject to delays due to adjustment of insurance claims, labor troubles and causes beyond Owner's control. After any such casualty, Tenant shall cooperate with Owner's restoration by removing from the premises as promptly as reasonably as possible, all of Tenant's salvageable inventory and movable equipment, furniture, and other property. *Tenant's*

*liability for rent shall resume five (5) days after written notice from Owner that the premises are substantially ready for Tenant's occupancy.*" (Emphasis added.)

Interestingly, subsection (c) of the provision states that if the premises are rendered unusable, the tenant's obligation to pay rent ceases "until the date when the premises shall have been repaired and restored by Owner," which, if read alone, would seem to re-establish the obligation to pay rent on the date of the premises' restoration. Indeed, it is not until the very last sentence of subsection (d) that the reinstatement of the tenant's rent obligation is made contingent upon prior written notice. Before that, the subsection discusses several other rights and obligations, including the owner's right to terminate the lease if it chooses to demolish or rebuild rather than make repairs, the owner's obligation, if it chooses to repair, to do so expeditiously, and the tenant's obligation to fully cooperate with the restoration by removing its property. Yet, of course, the final sentence of subsection (d), the statement that "Tenant's liability for rent shall resume five (5) days after written notice from Owner that the premises are substantially ready for Tenant's occupancy," is understood to modify the provision of subsection (c), which otherwise appears to reinstate the tenant's rent obligation on the very date the premises are restored.

The same logically holds true for rider paragraph 3: the final sentence of subsection 9 (d) modifies its provision, which otherwise appears to reinstate the lease on the actual date of restoration, so as to reinstate it after the tenant is provided with notice of the restoration. Indeed, it makes little sense to provide for the landlord to have the ability to reinstate the lease without simultaneously reinstating the tenant's obligation to pay rent under the lease. The landlord's contractual right to reinstate the lease is, at the least, intertwined with its right to reinstate the tenant's obligation to pay rent.

The distinction made by the dissent between these two provisions is a semantic one. Certainly, paragraph 3 is a separate provision of the lease, with a separate purpose; however, subsections 9 (c) and (d) are also distinct provisions with distinct points to cover. Yet, the obligations discussed in these various provisions are interrelated: they all concern how and when the tenant's obligations under the lease are either eliminated or reinstated after a casualty renders the leased premises unusable. The absence of a written notice provision

in rider paragraph 3 itself is not dispositive. The most reasonable way to read the lease is to consider the two provisions together, as providing for the event of a complete casualty, leading to the conclusion that the written notice provision at the very end of lease subsection 9 (d) must logically be as applicable to rider paragraph 3 as it is to lease subsection 9 (c).

But, it is not merely the interrelated nature of subsections 9 (c) and (d) and paragraph 3 that supports the conclusion that a five-day written notice of restoration is required in order to reinstate the tenant's lease obligations. The purpose of the rules of contract construction, after all, is to help us determine *the intent of the parties (see Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.*, 32 NY2d 285 [1973]; 22 NY Jur 2d, Contracts § 224, at 270). If the apparent meaning of a single contract term, or the apparent inference to be taken from the absence of a contract term, seems contrary to what the parties would have intended, it is incumbent upon us to reconsider that term, or absence of a term, in the context of the whole writing, to determine whether another, more feasible intent can be gleaned from considering those words in their larger context.

Here, it is difficult to conceive of how or why the parties to this commercial lease, when entering into it, would have intended to provide that the landlord could reinstate the lease without simultaneously reinstating the tenant's obligation to pay rent under the lease. Reinstating the lease after the premises have been restored is virtually synonymous with putting the tenant back in possession, and it is unthinkable that a landlord would place the tenant back in possession without simultaneously providing for reinstatement of the tenant's rent obligation. The procedure required by the lease to put the tenant back in possession and reinstate the tenant's rent obligation must be one and the same with the procedure necessary to reinstate the lease. Reading rider paragraph 3 to permit reinstatement of the lease, separate and apart from reinstatement of the tenant's rent obligation, is contrary to common sense, and we therefore cannot conclude that it is what the parties intended.

Furthermore, it is apparent that with rider paragraph 3, the parties intended both to give the landlord substantial time to restore damaged property, and to create a clear-cut and absolute outside time limit to the parties' rights and obligations following a substantial casualty which made the premises unusable. This time limit would necessarily cover both the

landlord's right to reinstate the rent obligation as provided for in article 9, and its ability to avert termination of the lease pursuant to a 12-month notice provided for within paragraph 3. Indeed, it is fair to say that rider paragraph 3 protects the tenant from being kept on the hook past the one-year mark, unable to operate its business in the leased premises but also indefinitely unable to relocate to alternate premises.

In order to protect the tenant in the manner rider paragraph 3 intends, the lease must be interpreted so as to give the tenant the *certainty* that as of the set deadline, it will have either the right to be back in possession or the right to relocate to alternative premises. Where that right to be restored to possession turns on a circumstance that will not necessarily be within the tenant's knowledge, there can be no such certainty.

Notably, not all repairs are observable; they may include infrastructure work, such as electrical or plumbing work, the completion of which would only be known to the party who hired and arranged for payment of the contractor. Indeed, such work may even require a permit and a sign-off upon completion (*see e.g.* Administrative Code of City of NY §§ 27-147, 27-3018), the grant of which would be solely known by the owner, not the tenant. This leaves the tenant without the independent ability to determine whether the restoration is completed. On the date when the 12-month period ends, the tenant cannot know for certain that the restoration is completed, unless it obtains that information from the owner—and the owner has no contractual obligation to make that knowledge available to the tenant within that time frame.

Yet, the interpretation of the lease proposed by defendant would leave open the possibility that the landlord could successfully complete the restoration of the premises within a year, but—whether intentionally or from neglect—not notify the tenant until days, weeks or even months later. This would leave the tenant without the certainty of a definite outside date after which it may safely consider itself released from the lease and provide itself with alternate business premises.

The dissent acknowledges that interpreting rider paragraph 3 as it does would make it necessary for the tenant to "monitor the condition of the property" in order to determine whether or not it has been restored within the one-year period; but, it asserts that "such is not an unreasonable burden for a party seeking to avoid the remaining nine years of a million dollar 10-year lease." This statement implies that it is appropriate to impose such a monitoring obligation upon the tenant since the

tenant is receiving a substantial benefit by being permitted to terminate its lease obligations.

However, imposing on the tenant this additional obligation of continually monitoring the condition of the property is an unreasonable burden, placed on the wrong party, first of all because the lease terms already put the tenant at a tremendous disadvantage in the event of a substantial casualty. Under this lease, once the premises have been rendered unusable, the tenant's business operations must be completely interrupted, yet the tenant is unable to relocate to alternate premises, since at any time for the following 12-month period it is obligated to retake possession and resume paying rent merely upon five days' notice of the landlord's completed restoration. Moreover, the tenant has no right to control the timing, or even the occurrence, of restoration work. Conceivably, the tenant could leave its business in limbo the full 12 months, only to ultimately discover that the landlord had not had the necessary work performed, leaving the tenant to then arrange for an alternate business location.

Secondly, not only is the tenant *not* receiving a substantial benefit by being given a right to be relieved of its lease obligations, but in fact, this lease gives the tenant *less* protection than would a lease containing no provisions at all relating to a complete casualty; in such a case, the tenant would have the right, under Real Property Law § 227, to simply surrender the premises in the event a casualty rendered the premises unusable.

As to defendant's suggestion that the tenant is as capable as the landlord of determining whether and when the premises are once again usable, we must disagree. Mere visual monitoring of the condition of the property will not necessarily give the tenant accurate knowledge as to whether the restoration is completed, particularly given the possibility of infrastructure work or the need for certification from a municipal agency. Nor does the tenant have the same right or ability as the landlord to communicate directly with contractors or municipal agencies. The only truly accurate means available to the tenant for finding out whether the restoration is completed is a direct inquiry of the landlord. Therefore, in effect, the dissent's interpretation of the lease requires the tenant who is out of possession due to a severe casualty to affirmatively seek from the landlord, on a regular basis, notice of the completion of the restorative work. A realistic reading of the lease, requiring a five-day written notice of restoration from the landlord, would obviate this

awkward requirement, and place the burden on the only appropriate shoulders: those of the landlord, the only party certain to possess that information.

For these reasons we conclude that only proper way to read the lease is to recognize that the requirement of five-day written notice of completion of restoration must have been intended to be as applicable to the landlord's right to avert a termination as it is to the landlord's right to reactivate the tenant's rent obligation.

Finally, there is no merit to defendant's protest that reading the contract this way will jeopardize thousands of commercial leases and the landlords and tenants who rely on the standard form lease of the Real Estate Board of New York. This dramatic assertion ignores the fact that it was the parties who altered the terms of the standard form lease by their addition of a rider to the standard form lease. Nor is there any merit to defendant's contention that reading the lease to require written notice of the completed restoration in order to avert termination constitutes an improper "forfeiture." Defendant will still own the property, and may still rent the premises in question.

We therefore agree with the conclusion reached by the motion court: the 12-month period having passed without the landlord providing the tenant with the requisite notice that restoration was complete, the December 16, 1997 termination notice became effective and the lease was terminated prior to the landlord's subsequent attempt to provide such notice. Plaintiff was entitled to summary judgment.

Accordingly, the judgment of the Supreme Court, New York County (Herman Cahn, J.), entered August 10, 2001, which, upon a grant of plaintiff's motion for summary judgment on its claim that its lease with defendant was properly terminated, awarded plaintiff the amount of $170,161.29, representing its security deposit and rent overpayments plus prejudgment interest, should be affirmed, without costs. Appeal from the order, same court and Justice, entered on or about August 2, 2001, should be dismissed, without costs, as subsumed in the appeal from the ensuing judgment.

GONZALEZ, J. (dissenting). In my view, the majority's holding sanctions the judicial rewriting of the parties' lease by imposing a written notice requirement on the landlord that does not exist under the plain terms of that document. Accordingly, I respectfully dissent from the majority's holding and would reverse the grant of summary judgment to plaintiff.

This action arises out of a 10-year lease dated October 24, 1996 between plaintiff The Vermont Teddy Bear Co. (VTB), as tenant, and defendant 538 Madison Realty Company (538), as landlord, for retail space located on the ground floor of 538 Madison Avenue (the premises). At some point in 1997, VTB decided to discontinue its business operations at the location and informed 538 that it intended to vacate the premises after the 1997 holiday season. VTB hoped to arrange an assignment of the lease to a new tenant. On December 7, 1997, a large portion of the southern facade of the building adjacent to 538 Madison Avenue collapsed, causing substantial damage to 538 Madison Avenue and the surrounding area. As a result, VTB was unable to continue its retail business operations at the premises.

Paragraph 3 of the rider to the parties' lease states, in pertinent part:

"[I]n the event that the Premises are totally damaged or rendered wholly unusable Tenant shall provide Landlord within thirty (30) days of the fire or casualty, a written notice of Tenant's election to terminate the Lease if the Premises are not restored within one (1) year after Owner's receipt of such Tenant's notice. In the event the Premises are not restored within such one (1) year period the Lease shall be deemed terminated as of the end of the 12 [month] period and both Landlord and Tenant shall be released from all obligations which may arise after the Termination Date."

Article 9 of the lease provides, in part: "After any such casualty, Tenant shall cooperate with Owner's restoration by removing from the premises [all of Tenant's property]. Tenant's liability for rent shall resume five (5) days after written notice from Owner that the premises are substantially ready for Tenant's occupancy."

On December 16, 1997, VTB wrote a letter to 538's managing agent demanding reimbursement for a portion of the prepaid December rent, confirming its intention to vacate the premises after the holiday season and requesting that the managing agent secure a subtenant. The letter further provided notice to the managing agent that, pursuant to the lease agreement, VTB intended to terminate the lease if the premises were not restored within one year.

By letter dated January 19, 1998, 538's managing agent responded that VTB would be in default if it vacated the

premises and demanded assurances that VTB intended to continue performance under the lease. 538's letter further stated that repairs to the premises had begun and that it would notify VTB as soon as the space was ready for occupancy. However, it is undisputed that between January and December 1998, VTB paid no rent for the premises and 538 never gave written notice to VTB that the premises had been restored.

By letter dated December 21, 1998, VTB declared the lease to be terminated based on the fact that more than one year had elapsed since VTB had sent its notice to terminate. VTB noted that it had not received any notice from 538 that the premises had been restored, that it could reoccupy the premises or that VTB's obligation to pay rent had recommenced.

On December 24, 1998, 538 responded in a letter stating that the lease remained in effect because the premises had been restored and was substantially ready for occupancy as of July 7, 1998. Defendant demanded back rent from July 8, 1998 through December 31, 1998, and further demanded that VTB reoccupy the premises.

In May 1999, VTB commenced the instant action, seeking a declaration that the lease was properly terminated, the return of its $150,000 security deposit and a refund of rent overpayments from December 1997. VTB moved for summary judgment, and the IAS court granted the motion. The court concluded that 538 had failed to submit any "meaningful evidence" that it had restored the premises within one year and that, in any event, it had failed to provide VTB with written notice that the premises had been restored as required by article 9 of the lease. On this latter point, the court rejected 538's argument that "mere restoration of the premises, without written notice to the tenant, would have sufficed under the terms of the Lease." The court reasoned that "[t]he obligation to restore the premises within a year under paragraph 3 of the lease rider cannot be reasonably read in isolation from the obligation to give written notice of such restoration in [article] 9, as such an interpretation would permit the landlord to avert termination indefinitely beyond the one year period by simply withholding notice."

It is well established that lease interpretation is subject to the same rules of construction as are applicable to other agreements (*Backer Mgt. Corp. v Acme Quilting Co.*, 46 NY2d 211, 217 [1978]). "The parties' intention should be determined from the language employed, and where the language is clear and unambiguous, interpretation is a matter of law to be deter-

mined solely by the court [citations omitted]" (*1009 Second Ave. Assoc. v New York City Off-Track Betting Corp.*, 248 AD2d 106, 107 [1998], *lv dismissed* 92 NY2d 947 [1998]). Courts should not rewrite the terms of an agreement under the guise of contract interpretation (*see 85th St. Rest. Corp. v Sanders*, 194 AD2d 324, 326 [1993]).

The plain meaning of paragraph 3 of the lease rider is that in circumstances where the premises have been rendered wholly unusable due to casualty, and the tenant has properly served a notice to terminate the lease, the lease is automatically terminated if "the Premises are not restored within such one (1) year period." Thus, in regards to the tenant's right to terminate due to casualty, the failure to restore within one year is the sole and exclusive ground for termination of the lease. Nowhere in the parties' agreement does it say that the lease is terminated if the landlord fails to provide written notice of restoration within a year. Under the agreement, restoration alone is sufficient to avoid termination. If the parties had intended to require written notice by the landlord signaling the completion of the restoration, it would have been easy to add such a requirement (*see id.*).*

In imposing an additional notice condition upon 538 in order to avoid termination, the reasoning of the IAS court and the majority is flawed in several respects. While they correctly note that the agreement must be read as a whole, they erroneously relied on this principle to impose a notice requirement that otherwise did not exist. The two lease provisions dealt with distinct issues—paragraph 3 of the rider covered the landlord's obligation to restore the premises within one year to avoid termination of the lease, and article 9 dealt with the landlord's written notice obligation before the tenant's rent liability recommences after a casualty. There is nothing inherently contradictory or implausible about requiring written notice before a tenant's rent liability recommences while simultaneously permitting a landlord to forestall termination of the lease by mere completion of an act—the restoration of the property—without requiring written notice thereof.

Although the IAS court found it reasonable to engraft the written notice requirement for resumption of rent liability onto the landlord's obligation to restore within one year, because "a tenant out of possession is not likely to become aware of the

---

* We note that the parties' lease required "written notice" in other circumstances, such as when either the tenant or the landlord notified the other party of their election to terminate the lease.

premises' restoration without notice," a rationale the majority adopts, that is not what the agreement says. Nor is the lack of a written notice requirement prejudicial to the tenant in these circumstances. Because the tenant's liability for rent recommences only after written notice that "the premises are substantially ready for Tenant's occupancy" is provided by the landlord, the landlord has strong economic incentive to provide such notice as soon as the premises are restored. There is no logical reason for a landlord to complete the repairs, thereby forestalling termination of the lease, but then intentionally withhold notice of restoration to the tenant, and by doing so, forfeit the reactivation of the tenant's liability for rent.

Additionally, the IAS court's rationale that written notice of restoration must be required by the lease since otherwise, the landlord could "avert termination indefinitely beyond the one year period by simply withholding notice," is simply not accurate. Termination of lease by a tenant is authorized only where, after proper notice to the landlord of an intent to terminate, the landlord fails to restore the property within one year. If the property is not restored within a year, the lease is automatically terminated—there is nothing the landlord can do to delay or prevent this outcome. While it may be necessary for the tenant to monitor the condition of the property in order to demonstrate that it was not restored within one year, such is not an unreasonable burden for a party seeking to avoid the remaining nine years of a million dollar 10-year lease.

Accordingly, in my view, the written notice requirement of article 9 of the parties' lease does not apply to the requirement in paragraph 3 of the lease rider that the landlord must restore the property within a year to prevent termination. To the extent the court's grant of summary judgment to plaintiff was based on a lack of written notice of restoration, that portion of the court's order should be reversed.

Nor is VTB entitled to summary judgment on the basis that it has demonstrated, as a matter of law, that the property was not restored within one year. There is a clear question of fact as to whether 538 restored the premises within one year of receiving VTB's notice of intent to terminate. Indeed, VTB offers no direct evidence concerning the condition of the premises. Rather, it surmises that 538's failure to demand rent between July and December 1998 must be due to the fact that the premises had not yet been restored—since there is no possible motive for 538 to waive six months rent. This argument hardly establishes the nonrestoration of the property as a matter of

law; and 538's reasons for not providing notice of restoration, or not demanding rent from VTB despite the claimed restoration in July 1998, cannot fill in the gaps in proof regarding the actual condition of the premises. VTB's failure to meet its burden of demonstrating entitlement to judgment as a matter of law requires denial of its motion, regardless of the sufficiency of the opposition papers (*see Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]).

BUCKLEY, P.J., and ROSENBERGER, J., concur with SAXE, J.; LERNER and GONZALEZ, JJ., dissent in a separate opinion by GONZALEZ, J.

Judgment, Supreme Court, New York County, entered August 10, 2001, affirmed, without costs. Appeal from order, same court, entered on or about August 2, 2001, dismissed, without costs, as subsumed in the appeal from the ensuing judgment.