OPINION OF THE COURT
Fuchsberg, J.
Early in 1970, appellant, Acme Quilting Company, entered into an agreement with the respondent, George Backer Management Corporation, for the rental of office space in the respondent’s building. The lease the parties ultimately signed included an escalation clause under which increases are keyed to certain wage rate increases. The dispute in this case, in the main raising issues of ambiguity, mutual mistake, fraud and unconscionability, revolves about that clause.[1]
The clause is paragraph 39(b) of the lease. It provides that *215 if, in any year of the lease, "the RAB [Realty Advisory Board] rate shall be greater than the RAB Labor Rate [for the period of 12 months prior to the commencement date], the Tenant shall pay to Landlord as additional rent * * * an amount equal to the product obtained by multiplying the Wage Rate Multiple by three-quarters (%) of the number of cents * * * by which the RAB Labor Rate * * * exceeds the RAB Labor Rate for the Base year”. The lease also tells us that "Wage Rate Multiple” shall mean the figure 7,245.
The RAB labor rate is defined in paragraph 39(b) as: "the aggregate of (a) the average of the minimum regular hourly wage rates for porters, handymen, elevator operators, starters and watchmen as applied to this building pursuant to an agreement between the Realty Advisory Board on Labor Relations, Incorporated (or any successor thereto) and Local 32-B of the Building Service Employees International Union, AFL-CIO (or any successor thereto) or, if no such agreement is in effect at such time, the average of the minimum regular hourly wage rates then actually being paid by Landlord or by the independent contractors who furnish such services to the demised premises, (b) the total amount, computed on an hourly basis, of social security, unemployment and disability insurance and payroll and other taxes imposed upon or measured by such wages, and (c) the total amount, computed on an hourly basis, of all benefits required by law and/or such agreement to be paid to or for such personnel.”
It is clear from the record that there was nothing routine about the way in which these provisions came into being. It would be impossible to argue that they contained any element of adhesion. Backer, by its treasurer, Arthur Lukach, first submitted a proposed lease. It was then analyzed by Acme’s vice-president, Richard Rattner, who was not only a member of the Bar but, perhaps more important in the present context, a corporate executive in the multimillion dollar business of his principal with 20 years of business experience behind him. Rattner did not rest on his analysis; he prepared a comprehensive memorandum on certain of its provisions, including the very clause with which we are now concerned.
Additionally, by happenstance, the course of the negotiations required both sides to repeatedly focus on it. For example, though the initial discussions were suspended because of uncertainty over whether the existing tenant would vacate within the time required for Acme to commence occupancy, *216 they were thereafter resumed with renewed vigor when Acme’s broker discovered other suitable space in the building. Again, a lease containing the identical escalation clause was reviewed by Acme, which this time offered to sign the lease but raised specific written objections to the escalation clause. Backer’s response was to reject the offer. Shortly thereafter, a fresh series of negotiations was undertaken at the instance of another broker. Once more, the rent escalation provision merited special attention. But despite what Acme concedes were extensive discussions between Rattner and Lukach, while Acme succeeded in having certain changes incorporated into the lease, the escalation clause was completely intact when the document was executed. From beginning to end the discussions took roughly half a year.
The record also reveals that, since it was not a member of the owners’ unit for which the Realty Advisory Board would act in negotiating industry-wide collective bargaining agreements with labor unions representing the classes of employees whose wages were involved here, Backer was not bound to, and in fact did not, accept the RAB’s labor scale for its employees. The scale in effect at its building was a lower one.
After a period during which Backer had not billed Acme for increases responsive to the RAB standard, the time came when Acme, no doubt because the RAB had negotiated a new scale providing for a substantial increase in wages, refused to comply with Backer’s demand that it remit payment in an amount reflecting the application of 39(b) to the RAB rate. Backer then commenced suit to recover the arrearages so computed. Acme, characterizing paragraph 39(b) as "shamefully ambiguous and unintelligible” and urging, by way of affirmative defense, that it was unconscionable, asserted that the clause should be read to limit the escalation to sums computed by reference to wage increases actually paid by the landlord. It further alleged that Lukach, on Backer’s behalf, had expressly represented that the cost of any increase to Acme "in no event, would exceed an amount equal to four or five per cent of the base rate for any particular year”. These grounds, according to Acme, entitled it to have the lease provision reformed under a theory of mutual mistake or, in the alternative, mistake on its part and fraud on the part of Backer.[2]
*217 The Supreme Court, finding the clause ambiguous and the facts controverted, entered an order denying Backer’s summary judgment motion.[3] The Appellate Division unanimously reversed on the law, granted the motion as to liability only and remanded for assessment of damages. The parties having stipulated on the amount due in lieu of assessment, final judgment was then entered by the Supreme Court. On this appeal by Acme, the order of the Appellate Division is now brought up for review pursuant to CPLR 5601 (subd [d]). For the reasons hereinafter detailed, we believe the order should be affirmed.
Looking first at the claim of ambiguity, we observe that a lease is subject to the rules of construction applicable to any other agreement (Farrell Lines v City of New York, 30 NY2d 76, 82). We also note that the lease in this case was entered into at arm’s length and, ultimately, on terms — most particularly those contained in the lease’s rider where paragraph 39(b) is to be found — which were the residue of suggestions and countersuggestions on which each of the two sophisticated parties had attempted to persuade the other to join it in a meeting of the minds. True, the language of the clause may seem dull and labored to the uninitiated, an unremarkable circumstance because it recites what is largely a mathematical formula to be applied on stated contingencies. But, taken step by step, any semblance of complexity disappears. Moreover, it was not a novel provision, but one commonly found in New York City commercial leases (see Romance Bridals v 1385 Broadway Co., NYLJ, Jan. 27, 1976, p 6, col 3 [Fein, J.]).
Acme, however, going beyond the description of the formula which consumes most of the clause, contends that the words "as applied to this building” must limit the wage calculation to those employees working on the property itself. This interpretation, though, is at odds with the thrust of the remainder of that sentence of paragraph 39(b) which refers to the RAB collective bargaining contract’s schedule of varying wage rates for employees of different classes of buildings. It seems obvious to us that the purpose of that reference was to relate additional rent increases to a fluctuating factor beyond *218 the control of either party, namely, the RAB wage rate for particular employees; that undertaking is not qualified by any condition that Backer be a party to the RAB agreement.
Significantly, the lease contains no requirement that rent escalations be measured by actual costs as opposed to the common industry-wide criterion chosen by the parties here. Had that been their intention, surely no problem of draftsmanship would have stood in the way of its being spelled out. Language as simple as that in the first sentence of this paragraph would have served the purpose. Instead, 39(b) explicitly states that the actual wages paid to building employees are not to be considered unless no collective bargaining agreement is in effect.
Nor was the operation of the clause unconscionable. Acme assumed the precise risk of which it now complains— that the RAB labor rate would rise so as to substantially increase its monthly rental payments. But parties are free to make their own contracts. Here Backer no doubt believed that it was to its economic advantage to tie the rent escalation clause to the RAB rate; though it needed no other reason, perhaps Backer also believed that if it were able to operate the building at lower than prevailing cost, it and not the tenants should be the beneficiary of its enterprise. Acme’s view, fueled by its own self-interest, understandably would be the opposite.
Once a contract is made, only in unusual circumstances will a court relieve the parties of the duty of abiding by it. By no means did such circumstances exist here. Indeed, the indexing of rent or wage increases to outside factors, such as, for instance, the cost of living index, which may or may not directly affect particular parties, is commonplace. So, a cost of living clause in a lease would certainly be enforceable though, by reason of a fixed long-term mortgage or fixed ground rent or stability in the real estate tax rate or all of these, a particular landlord is largely insulated from the effects of rising costs. Thus, the wage rate clause here contravened no principle of public policy nor is its effect so onerous as to shock the conscience (cf. Mandel v Liebman, 303 NY 88, 93-94; Real Property Law, § 235-c). Hence, judicial interpretation will not relieve Acme of what it may now regard as a burdensome bargain.
 We turn now to Acme’s claim for reformation. Its allegation of mutual mistake or fraudulently induced unilat *219 eral mistake describes the classic grounds for such relief (Albany City Sav. Inst. v Burdick, 87 NY 40, 47; 3 Pomeroy, Equity Jurisprudence [5th ed], § 870; Restatement, Contracts, §§ 504, 505). The claim of mutual mistake need not detain us. The undisputed history of the negotiations demonstrates beyond cavil that the language of the clause that Lukach proposed and to which he resolutely adhered reflects precisely what the lessor intended^ and the unilateral mistake of Acme would not suffice to invoke reformation (Curtis v Albee, 167 NY 360, 365; 3 Pomeroy, Equity Jurisprudence [5th ed], § 870a). Acme posits its alternate claim of fraudulently induced unilateral mistake on the oral misrepresentations allegedly made by Lukach to induce in Rattner a mistaken conception as to the operation of the wage rate escalation provision. On this theory, too, we must deny the requested relief.
Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties (Ross v Food Specialties, 6 NY2d 336, 341; 13 Williston, Contracts [3d ed], §§ 1548, 1549). Equity evolved the doctrine because an action at law afforded no relief against an instrument secured by fraud or as a result of mutual mistake(see 5 Holdsworth, History of English Law, pp 292-293, 327-328). But to overcome the heavy presumption that a deliberately prepared and executed written instrument manifested the true intention of the parties, evidence of a very high order is required (Christopher & Tenth St. R. R. Co. v Twenty-Third St. Ry. Co., 149 NY 51, 58). And well that it is, for freedom to contract would not long survive courts’ ready remaking of contracts that parties have agreed upon (Nash v Kornblum, 12 NY2d 42, 46). All the more so when a litigant seeks to invoke the power of the court, not merely to sever the contractual relationship between the parties, but, as here, to continue that relationship in a modified form. It follows that a petitioning party has to show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties (Williston, Contracts [3d ed], §§ 1548, 1597).
The requisite standard of proof has been stated variously (Amend v Hurley, 293 NY 587, 595 ["clear, positive and convincing evidence” so as to demonstrate not the probability *220 by the certainty of error in the making of the contract]; Porter v Commercial Cas. Ins. Co., 292 NY 176, 181 ["evidence of the clearest and most satisfactory character”]; Christopher & Tenth St. R. R. Co. v Twenty-third St. Ry. Co., supra, p 58 [proof of "the most substantial and convincing character”]). Allowing for difference in expression, all the cases demand a high order of proof. It would serve no purpose to add yet another definition. Rather, the definitions may more easily be conceptualized for our present purposes if we think in terms of what is to be avoided. Viewed from that perspective, the evidentiary requirement " 'operate[s] as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory’ ” (Southard v Curley, 134 NY 148, 151).
As a matter of law, no showing free of contradiction or equivocation comes through from the affidavits submitted by Acme. The history of the lease negotiations between Backer and Acme discloses continuing awareness on the prospective tenant’s part that the wage rate escalation provision might be potentially disadvantageous. The negotiations were conducted in a most businesslike, meticulous and unhurried manner by both sides. These produced substantial economic modifications to Acme’s advantage. And, only a month before the culmination of the negotiations, when Rattner advised Lukach that he was not satisfied with the clause, the latter remained steadfast and the lease containing the now objectionable provision was accepted by the tenant in unchanged form.
Furthermore, patently, Lukach’s purported oral interpretation of the clause as limiting Acme’s liability to about "four or five percent” of the actual wage rate sets forth no reasonable ground for reliance. The very indefiniteness of the figures confirms this statement as an expression of opinion rather than of fact. Above all, it did not relate to a concrete fact or a past or existing event. At best, it was no more than an expression of expectations as to labor agreements which had not yet been negotiated and the outcome of which, as both parties knew, could not be foretold. As a matter of law, then, it cannot form the basis for a claim of misrepresentation (see Woodmere Academy v Steinberg, 41 NY2d 746, 751).
Accordingly, mindful that this is an appeal from the disposition of a summary judgment motion, we conclude that the evidentiary facts put forth to defeat Backer’s motion were insufficient to achieve that end. Even if, given the procedural *221 posture, we accept Rattner’s credibility, Acme has not demonstrated a bona fide and substantial defense. (See Capelin Assoc. v Globe Mfg. Corp., 34 NY2d 338, 343; Julien J. Studley, Inc. v Goldner, 28 AD2d 1103; 6 Carmody-Wait 2d, NY Prac, § 39:33, p 483.)
Therefore, the judgment appealed from and the order of the Appellate Division now brought up for review must be affirmed.

. All further references to an escalation clause in this opinion are to paragraph 39(b). Among its other provisions, the lease also contained a real estate tax escalation clause.

. In the courts below, Acme also unsuccessfully argued that Backer’s acceptance of *217 the base rent in the first year of the lease constituted an estoppel against Backer demanding greater amounts. This point, however, is not raised by Acme on this appeal.

. It did grant summary judgment as to Acme’s additional rent liability under the separate real estate tax escalation clause as to which Acme admitted liability.