OPINION OF THE COURT
Martin Evans, J.
In this action for a declaratory judgment, plaintiff subtenant J. C. Penney Co., Inc., seeks a judicial construction of the real estate tax escalation clause contained in a prime lease, which it assumed by its sublease. Defendant landlord 1700 Broadway Company moves for summary judgment.
The controversy at bar arises out of the construction of a 42-story office building on the block bounded by Broadway and Seventh Avenue and 53rd and 54th Streets in New York County. While the building was still under construction, landlord entered into negotiations with defendant IBM for a long-term lease of a substantial portion of the structure’s space. The protracted negotiations, which spanned three months, and involved the exchange of several draft leases which were reviewed by each party’s legal and real estate experts, culminated in the signing of a lease on July 18, 1968. This prime lease granted IBM, as tenant, the use of 14 floors, plus basement space, at an annual rate of $1,342,734 for 15 years. It contained, in article 39, a real estate tax escalation clause designed to make the tenant share the burden of any future real estate tax increases according to the proportionate share of building space which the tenant occupied.
The clause, in pertinent part, provided:
"39. Taxes.
"(A) For purposes of this Article only, the following words and terms shall have the following meaning:
"(1) 'Real Estate Taxes’ shall mean all the real estate taxes and assessments, special or otherwise, levied, assessed or imposed by Federal, State or Local Governments against or upon the building of which the demised premises form a part and the land upon which it is erected. If due to a future change in the method of taxation, any franchise, income, profit or other tax, shall be levied against Landlord in whole or in part in substitution for or in lieu of any tax which would otherwise constitute a Real Estate Tax such franchise, income, *789 profit or other tax shall be deemed to be a Real Estate Tax for the purposes hereof.
"(2) 'First Full Assessment’ shall mean the assessed valuation of the building of which the demised premises form a part and the land upon which it is erected, as finally determined, for the first fiscal year for which Real Estate Taxes are assessed or imposed after completion of the building but in no event earlier than the assessment for the fiscal year July 1, 1969/June 30, 1970. For purposes of this Article the building shall be deemed completed when a Certificate(s) of Occupancy (temporary or permanent) covering at least eighty (80%) percent of the rentable area of the building has been issued by the Department of Buildings of the City of New York.
"(3) 'Taxes For The Base Year’ shall mean the Real Estate Taxes which would result from the application of the real estate tax rate for the Borough of Manhattan for the fiscal year beginning July 1, 1966 and ending June 30, 1967 to the First Full Assessment.
"(4) 'Subsequent Year’ shall mean any fiscal year after the fiscal year of the First Full Assessment.
"(B) If the Real Estate Taxes shall be increased for any Subsequent Year of this lease above such Taxes for the Base Year then Tenant shall pay, as additional rent, 37.8% (which the parties agree is the proportion which the rentable area of the demised premises bears to the total rentable area of the building of which the demised premises form a part) of such increase.”
Following execution of the prime lease, landlord continued construction, which included finishing the demised premises to IBM’s specifications. Approximately two months later, for reasons unclear to the court, IBM changed its plans, and attempted to divest itself of the space through assignment or sublease. Meanwhile, a temporary certificate of occupancy was issued for the building by the New York City Building Department on October 28, 1968, indicating completion of basic structural work (so-called "four walls” completion).
On November 4, 1968, IBM notified landlord of its desire to assign or sublease its space to Penney, following month-long negotiations during which the terms of the subtenancy took shape. Tripartite negotiations then took place which in turn culminated in the signing of the sublease and a supplementary letter agreement on January 17, 1969. By these agreements Penney expressly assumed the basic provisions of the *790 prime lease, including the real estate tax escalation clause. Penney was obligated to pay any increases under the clause to IBM, which in turn, was to forward them to landlord.
The specific question posed by plaintiffs first cause of action is the definition, within the context of the clause, of the "base year”, i.e., that fiscal period against which anticipated presumably higher future taxes would be reassessed. It is undisputed that article 39 clearly sets forth the formula by which such an escalation was to be computed. First, the "base year tax” is found by multiplying the property’s assessed valuation in the base year by the prevailing tax rate for the fiscal year 1966-1967. The product, the "base year tax” is then subtracted from the total tax of any given subsequent year. The difference in the amount of the taxes on the entire property is then divided by the proportionate share of the building’s space occupied by the tenant. The quotient represents the amount of the tax increase to be borne by the tenant, and which was assumed by Penney.
It is obvious that the amount of each such tax increase, by definition under article 39, was intended to reflect the interaction of several factors which the parties realized were not within their control. These variables are: (1) a future change or changes in the real estate tax rate from the 1966-1967 level; (2) a future change or changes in the assessed valuation of the property from the base year level; and (3) issuance of an appropriate certificate of occupancy so as to fix the base year itself. That is to say, the parties clearly specified the individual components and their relationship in the formula, because they realized that the components could not be prospectively quantified. A decade after the execution of the agreement at issue, subsequent changes in the tax rates and valuation are, of course, known and undisputed. It is the last component— the fixing of the base year — which is here in dispute, and through it, Penney’s ultimate tax liability.
Landlord has always contended that the base year of the escalation clause is plainly fixed by the self-contained wording of article 39 as the 1969-1970 year. Penney, however, claims that the escalation clause in article 39 is ambiguous and must be read in conjunction with other lease provisions, particularly those dealing with the completion of the space and assumption of occupancy. Given the alleged ambiguity of such terms as "certificate(s) of occupancy” and "completion of the building” Penney urges that paroi evidence of the circum *791 stances surrounding the lease and sublease negotiations, specifically its contrary understanding of the clause’s -provisions, is both probative and admissible. Penney concludes that under such an approach the lease fixes the base year as 1970-1971, or at the very least, presents a triable question of fact sufficient to defeat a motion for summary judgment.
Penney has already paid, under protest, the amounts landlord has claimed are owed under the clause. At stake here is the claimed improper over assessment, both past and projected, consisting of two different amounts: first, the entire $120,965.67 paid for the year 1970-1971 on the assumption that 1969-1970, rather than 1970-1971 is the proper base year for reference against succeeding years; and second, § 67,014.49 due in each succeeding year under the lease, representing the additional proportion of each subsequent annual increase attributable to the choice of the earlier year as the base year.
Penney is in error.. Not only is the clause, when either read alone or in conjunction with the lease as a whole, clear, specific and unambiguous; the record before the court does not disclose any triable issue. The escalation clause in article 39 is not only clear, it is carefully drawn so as to be entirely self-executing. Not only does it delineate the computation procedure, it specifies the subsequent event which is to trigger the procedure (i.e., the issuance of a certificate of occupancy), and defines within the context of the clause all significant concepts without reference to any other lease provisions. Operation of the escalation clause neither depends on an extrinsic definition, nor is affected by other lease provisions.
Even a casual reading of the clause plainly shows that the parties intended that the clause stand on its own by setting up a careful scheme of "legislative” definitions, i.e., defining each significant term for purpose of the clause only. (Lease, art 39, subd [A].) The base year is designated as "the first fiscal year for which Real Estate Taxes are assessed * * * after completion of the building” (Lease, art 39, subd [A], par [2]). The same paragraph defines completion in this context, as the time "when a Certificate(s) of Occupancy (temporary or permanent) covering at least * * * 80% * * * of the rentable area of the building [was] issued by the Department of Buildings”. It is undisputed that the Department of Buildings issued a temporary certificate on October 28, 1968. That certificate on its face covers the entire building. Since the issuance of the certificate is the subsequent event deemed by the clause to fix *792 the completion date of the building, which triggers the operation of article 39, it is apparent that the building was deemed completed as of October 28, 1968. The base year must therefore be the following fiscal year, i.e., 1969-1970.
Penney’s reliance on the concept of "substantial completion” contained in other lease provisions is misplaced. In essence, Penney argues that "completion of the building” should be held to be equivalent to "substantial completion” as defined in article 37. Rather than exposing ambiguity in article 39, or creating a question of fact, comparison with other clauses supports landlord’s position. Article 37 completion refers not to the building itself, but rather to the finishing of the tenant’s own space to the tenant’s own specifications. The certificate of occupancy was issued at the completion of the building structure. It was logical for the parties to use a different standard of completion (i.e., substantial completion of individual occupancy units) as a means of triggering the obligation to pay rent for individual units. As the Court of Appeals held in a strikingly similar situation, "The difference in the language of the two provisions, by which the parties must be deemed to have intended different meanings, makes clear that all that was required to trigger the tax escalation provision * * * was the issuance of a temporary certificate of occupancy.” (Hall & Co. of N. Y. v Orient Overseas Assoc., 48 NY2d 958, 959.)
It is axiomatic that a contract must be interpreted according to the intention of the parties. Parties are held to have intended that which they wrote. (2 Williston, Contracts [3d ed], § 338A; Laba v Carey, 29 NY2d 302, 308.) Absent inherent ambiguity, extrinsic paroi and documentary evidence, as proposed here by Penney, is unnecessary, and thus inadmissible as irrelevant to the question before the court. (Cf. Allied Clove Lakes Co. v Demisay, 74 AD2d 466; Colton v New York Hosp., 98 Misc 2d 957.)
In urging the court to adopt its "substantial completion” interpretation, Penney is in effect, asking for reformation of the tax escalation clause. Penney asserts that because both it and IBM understood the substantial completion standard of articles 36 and 37 to be applicable to the escalation clause, the court should reinterpret the provision at issue. Such a conclusion is both legally faulty and factually unsupported. Reformation is an extraordinary remedy. It can only be employed in a clear case of mutual mistake. It is meant to relieve all parties *793 to an agreement from the awkward situation created when the parties realize that the literal wording of the contract is at variance with all parties’ mutual intent, and the scrivener’s error if enforced literally, would bind them to something other than that to which they had agreed. Even if Penney’s assertions were accepted as true, they suggest, at most, a question of unilateral mistake, a legally insufficient basis for granting reformation of a contract found to be unambiguous. (Simpson, Contracts [2d ed], § 99 et seq.; 13 Williston, Contracts [3d ed], § 1547 et seq.) Penney has utterly failed to meet its burden of proof by "clear, positive and convincing” evidence. (See Ross v Food Specialties, 6 NY2d 336, 341 [upon which Penney relies]; Backer Mgt. Corp. v Acme Quilting Co., 46 NY2d 211.) There is no evidence that there was ever such a misunderstanding on landlord’s part; the evidence of misunderstanding proffered by Penney, largely hearsay, is unconvincing and insufficient to raise a justiciable question of fact. The lengthy negotiations among legal and real estate experts for both Penney and IBM prior to the signing of the prime lease, and its careful preparation (evinced by, inter alla, the initialing of each page by both parties) clearly demonstrate that each had ample opportunity to analyze the document and conform it to its understanding. Penney, knowing, it had to accept the escalation clause as written, as a condition of its subtenancy, also had adequate opportunity to analyze the lease and investigate the surrounding circumstances of the prime lease, the building’s construction, and the issuance of certificates of occupancy. Not only did Penney not question the meaning of the clause during the negotiations, the record discloses that in late December, 1970, Penney’s counsel during the sublease negotiations acknowledged that "the language of the lease supports the landlord’s contention that we must pay tax escalation for the 1970-1971 tax year.”
Penney also claims that it is being unfairly overcharged based on the clause’s use of 37.8% as the measure of the space it occupies. (Lease, art 39, subd [B].) Penney asserts that both its recent survey, and its analysis of Buildings Department records indicate that its space amounts to only approximately 32% of the entire structure.
The conclusion that the use of 37.8% is thus either mistaken or unjust must also be dismissed, as being both factually and legally insubstantial. There is no evidence of ambiguity or mutual mistake; rather, the clarity and specificity of the *794 wording indicate the contrary. Simply put, it is a "legislative” definition. Rather than leaving unresolved questions concerning either the methods of computation or measurement, or assumptions regarding rentability (questions to which Penney’s proffered survey — or any survey — are subject), the parties negotiated and agreed on a fixed percentage, which they deemed an appropriate equivalent of the proportion of space Penney was to occupy. Moreover, bearing in mind the absence of any probative evidence concerning the assumptions and methodology of Penney’s survey, a difference of approximately 5% is not so great so as to suggest unconscionability. Neither is there any showing of undue influence, inequality of bargaining power, misrepresentation or any other indicia of unconscionability. Penney never questioned the appropriateness of the agreed-upon percentage during the negotiations. Having neither conducted its own investigation, nor objected to the provision, and having accepted the benefit of occupancy under the stated terms, Penney should be estopped from now questioning the percentage.
Penney’s remaining two causes of action must be dismissed as a matter of law. The gravamen of its second cause of action is that the landlord "was unjustly enriched contrary to the intention of the parties” by successfully applying for reduction of its assessed valuation in the 1969-1970 and 1970-1971 tax years, without having given Penney prior notice. Penney asserts that such reduction resulted in a greater subsequent liability under the escalation clause. Penney’s unsupported conclusion is belied by the evidence. First, although the reduction in the 1969-1970 base year may have had the effect of slightly lowering the amount to be used as a reference in the future, Penney unquestionably benefited from the reduction in the 1970-1971 assessment, since such a reduction effected a lesser increase under the escalation clause.
Second, the lease itself neither bars landlord from applying for a reduced assessment nor mandates that landlord give tenant prior notice. Rather, implicit in the lease itself (Lease, art 39, subd [A], par [2], cl [c]) is the right of landlord to so apply without prior notice.
"(2) 'First Full Assessment’ shall mean the assessed valuation * * * as finally determined [emphasis added]
"(c) * * * In connection with reducing the assessed valuation and/or in connection with obtaining a refund of Real Estate Taxes, Tenant shall be responsible for its proportionate *795 share of any expenses, including reasonable counsel fees, incurred by Landlord.”
It is clear that such reduction proceedings were within the contemplation of the parties. Penney never questioned these provisions nor attempted to renegotiate them.
Third, there is no evidence of any devious or improper intent, either in drafting these provisions or in applying for a reduced assessment, which is a routine business practice. Penney has not even made a prima facie showing that landlord intentionally manipulated the assessment procedure to improperly and unjustifiably minimize base year taxes, so that future increases would be greater. Neither is there evidence that landlord, in negotiating with Penney, misled Penney into relying on the initial assessment, while surreptitiously applying for a reduction. (Cf. City Bank Farmers Trust Co. v Slater, Inc., 278 App Div 366, affd 303 NY 971.) A commercial lease, freely and intelligently negotiated by corporations possessing equal bargaining power may ultimately result in one party having a greater long term benefit than the other. Such a situation, depending on each party’s own assessment of consequences and alternatives, may or may not be a prudent investment; it is not ipso facto unjust or unconscionable. (See Backer Mgt. Corp. v Acme Quilting Co., 46 NY2d 211, 218, supra.)
Penney’s third cause of action alleges that article 39, as a tax pass-along, is contrary to public policy. There is no merit to this claim, and it should be summarily dismissed. Rather, allocation of tax liability inter se has long been regarded as a proper subject of agreement between landlord and tenant in New York. (See Matter of Burke, 62 NY 224.)
Defendant landlord’s motion for summary judgment is therefore granted. The court finds and declares that 1969-1970 is the base year under the tax escalation clause, and that the assessments under the clause should be computed accordingly. The second and third causes of action are dismissed. The cross claim by defendant prime tenant IBM against defendant landlord is dismissed.