OPINION OF THE COURT
Alan C. Marin, J.
*605 This is the decision following the trial, on liability, of the claim of James O’Donnell brought under the Unjust Conviction and Imprisonment Act, which is codified as section 8-b of the Court of Claims Act.
Early in the morning of Saturday, May 24, 1997, Emma E was assaulted in Clove Lakes Park on Staten Island, while at the park for one of her regular walks. On that morning, she arrived around 6:00 a.m. and proceeded to walk by the “little lake” at the parking lot and had done a number of circuits when she noticed a man she thought looked out of place amidst the walkers and joggers. Ms. E maneuvered so that he would pass her, and when that did not work, she walked over to a bench, again thinking he would go by her.
The man rushed over to Ms. E, and she remembers him saying, “You are coming with me . . . shut up or I will kill you.” He then exposed himself, saying, “take this.” Emma E was either pushed or fell to the ground, and the man straddled her and began to choke her. Ms. E tried to push her attacker away, and he bit her left hand (see claimant’s exhibits 52A-52D). Ms. E then passed out; when she came to, she still had her clothes on. Emma E testified[1] that only one man attacked her, and she saw only that person during the attack, although at one point said, “I don’t know if there could have been a second person there or not. I don’t know.”
Emma E was taken to St. Vincent’s Medical Center, and was seen at the emergency room at 7:50 a.m. (claimant’s exhibit 12). She was then treated by Dr. Godwin Onyeike, a resident physician who was training for a speciality in obstetrics and gynecology. Dr Onyeike prepared the Vitullo, or rape, kit.
Claimant James O’Donnell was arrested for the crime two days later and charged in a five-count indictment filed September 26, 1997. Following trial, he was convicted on April 28, 1998 of attempted first degree sodomy and one of the two counts of second degree assault.[2] Mr. O’Donnell was sentenced on May 19, 1998 to two concurrent prison terms of to 7 years; on April 27, 2000, he was released from prison following the results of DNA testing. (Claimant’s exhibits 1, 2.)
By a decision and order of Judge Joel Goldberg, dated December 12, 2000, claimant’s judgment of conviction was *606 vacated and the indictment dismissed. The decision and order was based on section 440.10 (1) (g) of the Criminal Procedure Law: newly discovered evidence, the DNA testing of certain biological material from the crime scene (claimant’s exhibit 3). Paragraph (g) of CPL 440.10 (1) is one of the specified grounds for bringing an unjust conviction claim. Beyond the threshold of showing a proper CPL ground and that claimant was sentenced and imprisoned, in order to recover under Court of Claims Act § 8-b, it must be proven by clear and convincing evidence that claimant did not commit any of the criminal acts charged in the indictment (§ 8-b [5]); and did not, by his own conduct, cause his conviction (§ 8-b [5] [d]).
Did Claimant Commit Any of the Acts Charged in the Indictment?
At the hospital, Dr. Onyeike collected samples from the victim: bite wound secretions were smeared with a paper towel and fingernail scrapings were taken. The samples were sealed in separate envelopes, which were then sealed within the rape kit. Dr. Onyeike testified that he was assisted by nurse Susan Brig-ante, who labeled and sealed the envelopes. (Claimant’s exhibit 16.)
Both samples were tested at Forensic Science Associates in Richmond, California, a leading laboratory for the DNA testing of biological material drawn from crime scenes. Dr. Edward Blake, a founder and partner of the laboratory with a Ph.D. in forensic science, testified at trial. His expert conclusion was that the DNA profile from the bite wound and fingernail scrapings were from the same male — and it did not match the DNA profile of O’Donnell.
The Office of the Chief Medical Examiner of the City of New York retested the paper towel with the dried saliva from the bite mark; the fingernail scrapings could not be retested since they were consumed by the testing in California. In any event, the Medical Examiner’s Office, through the testimony of one of its senior laboratory staff, Debra Briones, confirmed the finding of Forensic Science Associates: the DNA taken from the victim did not match that of James O’Donnell, but was that of an unknown male.
To prove chain of custody, it must be shown that the original evidence is “identical to that involved in the crime . . . and . . . has not been tampered with.” (People v Julian, 41 NY2d 340, 342 [1977].) In Julian, the Court of Appeals eased a strict interpretation of its earlier decision in People v Connelly (35 NY2d *607 171 [1974]), and provided that where there are reasonable assurances of identity and unchanged conditions, it is unnecessary to call every person who handled the evidence.
The rape kit, prepared and sealed at St. Vincent’s Medical Center, was given to New York City Police Officer Joseph Nazzaro on May 24, 1997, who signed for it and brought the kit to the 120th Precinct in Staten Island where it was vouchered. On May 28, 1997, Sergeant Joseph Beuther picked up the sealed kit at the 120th Precinct and took it to the Property Clerk’s Office of the Police Department in Long Island City. Both officers took the stand at the Court of Claims trial.
Over two years later, on November 22, 1999, because of a pending CPL article 440 motion brought by Mr. O’Donnell’s appellate attorney, the still-sealed kit was brought by Officer Nazzaro to David Frey, a Richmond County Assistant District Attorney (ADA). Conceding that he had never done so for any other piece of evidence, Frey testified that he kept the Emma R rape kit locked in his desk drawer until December 28, 1999, when still sealed, it was brought to the Office of the Chief Medical Examiner by Officer Nazzaro and logged in.
On January 3, 2000, a technician at the Medical Examiner’s Office, wearing rubber gloves, opened the sealed kit and took out each sealed envelope, unsealed them, took inventory, and then resealed each item. This was done in the presence of claimant’s appellate lawyer, Lori Shellenberger. The sealed kit was sent by UPS the next day to Dr. Blake at Forensic Science Associates, where the kit was unsealed, the DNA testing described above was performed, and the kit was resealed and returned via UPS on April 24, 2000 to the New York City Medical Examiner’s Office. On May 1, 2000, the sealed kit was opened and inventoried by Ms. Briones; testing was begun May 18, 2000 (after a new blood sample from claimant was obtained [see below]).
I find that the People v Julian standard was complied with in both the collection and preservation of biological material by Dr. Onyeike and its subsequent unsealings, which were done for a scientific or law enforcement purpose in accordance with proper scientific procedures that did not affect the integrity of the items; for that matter, defendant did not put an expert on the stand to challenge same. For example, Ms. Briones explained that her laboratory would not test the claimant’s blood sample that was tested in California because it was not vouchered, so the Medical Examiner’s Office had a new blood sample taken from O’Donnell in prison (claimant’s exhibits 26-28).
*608 From a purely scientific vantage, the DNA markings are unique, excepting identical twins, or mathematically virtually so: Dr. Blake concluded that the genetic profile of the unknown male from the paper towel sample and the fingernail scraping was shared by less than one out of every trillion males, a probability confirmed by Ms. Briones (claimant’s exhibit 42). In reality, however, the failure to test all of the evidence or the failure to exclude other persons who came into contact with Ms. P. could undermine the laboratory result that the crime was committed by one unknown male. Note, however, that contamination would add an additional DNA sample; it would not erase the original unknown male found.
Emma P.’s panties were not submitted for DNA testing (defendant’s exhibit G) because Dr. Blake said no semen was found and the facts of the incident made it highly unlikely that ejaculation had occurred (although they were blood-stained). The police vouchered the victim’s outer clothing as well as three tissues that were found at the scene and a slab of the park bench, but none of these were tested (defendant’s exhibits CC-EE). The map of the area made by the crime scene unit indicates that at least two of the tissues were found quite a distance from the subject park bench (defendant’s exhibit II). Also not tested was an “Item 1-8,” described as “pulled head hair.” These items apparently could have been tested by defendant.
Exclusionary testing was undertaken, which tested and excluded, among others, the EMS worker who placed Emma P in the ambulance, Ms. P’s partner and several other males who might have had some kind of contact with the victim (claimant’s exhibits 20-25, 29-35, 46-51). Defendant points out that the following males were not asked to give elimination samples: Dr. Onyeike, ADA Frey, Officer Nazzaro, Emma P’s son who lives with her, Dr. Bertram A., a jogger in the park, and a 60- or 65-year-old man in the park (defendant’s exhibit S.).
While Dr. Onyeike, at times, was not all that impressive a witness, I conclude he adequately followed procedures in preparing the rape kit; he wore gloves — a mask was not necessary. The older man in the park and Dr. A. had, at most, casual contact with Ms. P, which Ms. Briones credibly explained would not leave the kind of biological evidence found. Frey and Nazzaro only handled the rape kit when it was sealed. Emma P’s son is not a factor because, given his mother’s genetic profile, it was impossible for him to have the genetic profile of the deduced unknown male (claimant’s exhibit 45).
*609 In sum, defendant’s contention as to the failure to test certain items and individuals does not impair my conclusion that Mr. O’Donnell has proven, by clear and convincing evidence, his innocence of the crimes with which he was charged.
Did Claimant’s Conduct Cause His Conviction?
In its report to the Legislature which became the basis for the Unjust Conviction and Imprisonment Act, the Law Revision Commission listed as disqualifying conduct the following: removing evidence; falsely giving an uncoerced confession of guilt; attempting to induce a witness to give false testimony; attempting to suppress testimony; or concealing the guilt of another person (1984 McKinney’s Session Laws of NY, at 2932). Both the report and subsequent case law make clear that this list is illustrative and not all-inclusive. (See generally, Rogers v State of New York, 181 Misc 2d 683 [Ct Cl 1999], affd 280 AD2d 930 [4th Dept 2001].) In addition, among other conduct, offering a false alibi will bar recovery on the part of a Court of Claims Act § 8-b claimant. (Moses v State of New York, 137 Misc 2d 1081 [Ct Cl 1987].) This trier of fact does not find credible James O’Donnell’s alibi that, at the time of the commission of the crime, he was home asleep.
The night before Emma E was assaulted, O’Donnell and his wife-to-be Kim went to the house of claimant’s mother for a birthday celebration for his younger brother. O’Donnell and Kim Keefe had lived together since 1989 and were married during claimant’s incarceration; the two had one child, and Ms. Keefe (hereinafter Ms. O’Donnell) had a child from a previous relationship. Claimant stayed at the party a short time, leaving to play pool at Port Richmond Billiards, getting there at around quarter to 10. O’Donnell testified that he shot pool until 12:45 a.m. and arrived home at “about ten after one.” Ms. O’Donnell testified that this was only 10 minutes after her arrival, although she recalled her return home as between 11:30 p.m. and midnight.
In the earlier of claimant’s two statements to the police on May 26, 1997, he wrote that he had left the pool hall at 12:45 a.m., but in the second statement a few hours later, he changed it to 1:00 a.m. (defendant’s exhibits P and Q). By itself such may have little import, but it serves to underscore claimant’s lack of credibility on how he got from the pool hall to his house. He had two different stories, but under either version he got a ride home (claimant once had a driver’s license, but has not had one since sometime before the subject assault). Even though *610 claimant at trial went back to 12:45 a.m. as the time he left the pool hall, at some point he must have realized, it would make more sense that the trip involved — of a dozen or so blocks— would take 10 minutes by car, rather than 25 minutes.
To the police, O’Donnell said he took a cab home, one of Sam’s Cabs. At trial, claimant switched the story to this, which did not sound credible:
“Q. And then you took a cab home?
“A. I thought I did, but no, I got a ride home from somebody that I hadn’t seen in years that was at the pool hall, and I thought I took a cab home, but then I remembered I could have gotten a ride home. I don’t know which night it was, but the night in question before the crime I had gotten a ride home from a guy that I hadn’t seen in years that was at the pool hall, and he lives a little bit further past me from the pool hall, so he gave me a ride home.”
He went on to say, “There was one night I got a ride home from somebody, that I don’t remember his name . . . .” O’Donnell had not seen him in years, even though he lived a little past claimant, and did not supply any name or address, although he maintained that he could recall the kind of car it was. The car/ cab story is essentially this witness’ way of saying he went straight home, and thus leads into his alibi that he stayed there until 9:30 or 9:45 a.m.
Vivian Porcu, who had known neither the victim nor the claimant, testified that on the Saturday in question, she went for a walk in the park at about 6:30 a.m. with a friend and observed a lone man that she identified here as Mr. O’Donnell. Ms. Porcu testified that she had entered the park at the Mart-ling Avenue entrance, near the middle lake, Martling Lake. Emma P was assaulted at the next lake southeast of that— Clove Lake (“Bench 1” in defendant’s exhibit II).
Given the passage of seven years, some uncertainty about claimant’s hair length and color, and his loss of 20 pounds, to this trier of fact, Porcu was, by her demeanor, convincing in her identification of claimant as the man she saw in the park. She was willing to correct herself on her location and that of the victim, and readily conceded that she had no personal knowledge that claimant — the man she saw — was the man who attacked Emma P Porcu’s credible testimony goes to O’Donnell’s alibi, not to his culpability for the counts charged in the indictment of which his innocence was established by DNA testing.
*611 Two of his own statements, one written and one oral, further undermine the validity of O’Donnell’s professed alibi. In a letter to Kim from prison (apparently before they were married), claimant seems to be promoting the alibi, “I am innocent remember, I was home in bed asleep at 6:00 am. The crime happened after that . . . You saw me in bed ...” (defendant’s exhibit C at 1). Ms. O’Donnell’s mother, Helen O’Hare, testified that after she had helped bail her son-in-law out after his arrest, he told her that the only way he could have done the crime was if he had blacked out. Ms. O’Hare was a highly credible witness, a person with a no-nonsense way about her that came across as authentic. The significance of O’Donnell’s admission is not that he committed the assault, but that he was in the park: if he was fast asleep at home from 2:00 a.m. to 9:30 a.m., it would not have been necessary for claimant to say that the only way he could have committed the crime was if he had blacked out afterwards.
O’Donnell lived at 109 Willowbrook Road in a neighborhood near Clove Lakes Park, but still a considerable number of blocks away (defendant’s exhibit A). Claimant stated at one point in his testimony that he hung out in the park with his family, fished and walked his dogs there. Clove Lakes Park was well-used; on the Saturday in question, the park had plenty of walkers and joggers even at 6:30 a.m. Yet an inordinate amount of effort was spent by claimant, supported by his wife, to show that he rarely used the park, or only used it under special conditions, and that anything much past the first, northern-most lake (Brooks Lake) was out of claimant’s range. This was an effort which came across as forced and defensive. It is not a particularly large park; the distance from O’Donnell’s house to the park appears greater than the distance from Brooks Lake to the southern-most Clove Lake (defendant’s exhibit A).
Claimant testified that he only fished at Brooks Lake; Clove Lake has no fish, and as to the middle lake, O’Donnell explained, it has fish, “but I never fish there because I’ve never seen anything big taken out of there.” But claimant’s mother-in-law, who explained that in the spring of 1997 she saw her daughter frequently and who demonstrated familiarity with Clove Lakes Park, testified that claimant fished in the second lake, Martling Lake, because “that’s the only one that really has fish.” In his statements to the police, O’Donnell said that he had not been in the park, except to go fishing with friends and family since the previous June — nearly a year (defendant’s exhibits P and Q). *612 The three lakes, as defendant’s exhibit A shows, are close to one another; in fact, Ms. Porcu testified that from Martling Lake, she could see where the victim was at Clove Lake.
As discussed, claimant maintained he was at home with his wife asleep from a “little before 2 a.m.” until 9:30 a.m. Saturday morning, on May 24, 1997. The emphasis on how soundly claimant slept that night was not credible. Ms. O’Donnell said she was up all morning and did not use the bathroom for over three hours even though she had six cups of tea — all to prove that claimant was asleep and that she would have seen it had he awoken.
Ms. O’Donnell, who testified that at the time she was working 70-hour weeks for a major telecommunications corporation and until almost 8:00 p.m. the Friday night preceding the crime, said she had fallen asleep at around 2:00 a.m. She recalled waking up at 4:00 a.m. because the TV had been left on, noticed that claimant was asleep, then woke up for good at 6:00 a.m. and was in the apartment until about 11:00 a.m. Claimant left at quarter of 10, recalling a 10:00 a.m. appointment with his psychiatrist to fill prescriptions; his wife thought it had been an AA meeting that he was off to.
While his wife described O’Donnell as a heavy sleeper, she conceded that he had sleeping medication, but did not take it “that often” and was unable to sleep when he is nervous. James and Kim, in that period, slept on the daybed in the living room of their one-bedroom apartment, giving their two boys the bedroom. Early that morning, the younger boy was up watching cartoons, and the older boy was woken by his mother between 6:15 and 6:30 a.m. for his job at the zoo. There were two dogs in this small apartment; in fact when the eldest son left for work, one of the dogs would have to be held back.
In sum, claimant gave a false alibi, which is proscribed conduct under paragraph (d) of subdivision (5) of Court of Claims Act § 8-b. (Moses v State of New York, supra.) Paragraph (d) provides that claimant must prove by clear and convincing evidence that “he did not by his own conduct cause or bring about his conviction.” Clear and convincing evidence is evidence which satisfies the trier of fact that it is “highly probable” that what claimant contends happens is what actually occurred (PJI3d 1:64); it cannot be “loose, equivocal or contradictory” (George Backer Mgt. Corp. v Acme Quilting Co., 46 NY2d 211, 220 [1978] [citation omitted]).
*613 The story that Mr. O’Donnell was home asleep at the time of the crime is one that has inconsistencies and contradictions; it certainly may well have led to his conviction.[3] In any event, the burden is on claimant to satisfy paragraph (d) of Court of Claims Act § 8-b (5). Having failed to do so, claimant cannot therefore obtain a judgment in his favor under the Unjust Conviction and Imprisonment Act; James O’Donnell’s claim (No. 104340) is hereby dismissed.

. By agreement of the parties, at trial, Emma E’s testimony was her deposition of January 26, 2004 (defendant’s exhibit KK).

. Counts four and five of the indictment were separate charges of assault in the third degree.

. Inter alia, Ms. Porcu and Ms. O’Donnell testified at claimant’s criminal trial.