[886 NYS2d 5]

RESORT SPORTS NETWORK INC. et al., Respondents, v PH VENTURES III, LLC, et al., Appellants.

First Department, September 24, 2009

## APPEARANCES OF COUNSEL

*Pepper Hamilton LLP*, Philadelphia, Pennsylvania (*Thomas E. Zemaitis* and *Matthew R. Williams* of counsel), and *Pepper Hamilton LLP*, New York City, for appellants.

*McCormick & O'Brien, LLP*, New York City (*Liam O'Brien* of counsel), for respondents.

## OPINION OF THE COURT

MOSKOWITZ, J.

This case involves what defendants euphemistically describe as a "mutual mistake," but was instead defendants' unilateral error. On October 27, 2006, plaintiff RSN Acquisition Inc. (RSN Acquisition), plaintiff Resort Sports Network Inc. (RSN) and RSN Merger Sub, Inc. (Merger Sub) entered into a merger agreement to purchase all of RSN's stock. Advent International Corporation (Advent), defendants' general partner, signed as "Stockholder Representative" on behalf of defendants, three investment funds that the merger agreement defines as "Significant Stockholders" of RSN.

The merger agreement provided that, upon closing, RSN Acquisition would pay $4.65 million, adjusted pursuant to section 2.4. Section 2.4 (a) provided for closing adjustments related to an outstanding bank loan. Section 2.4 (b) provided for a working capital adjustment:

"(b) Working Capital Adjustment

"(i) Target Net Working Capital. The Parties acknowledge and agree that the *Merger Consideration has been determined based upon an estimated Net*

*Working Capital* (as such term is defined below) *of the Company equal* to $324,359 if the Closing occurs on or before November 30, 2006, $730,259 if the Closing occurs on or before December 31, 2006, *$948,659 if the Closing occurs on or before January 31, 2007, $1,437,059 if the Closing occurs on or before February 28, 2007* and $1,640,459 if the Closing occurs on or before March 31, 2007 (collectively, the 'Target Net Working Capital'). For the purpose hereof, *'Net Working Capital' as of any date shall be equal to the adjusted cash working capital value calculated as set forth on Exhibit B hereto for the month on which the Closing Date occurs.*[1]

"(ii) Adjustment. The Parties agree that there shall be a reduction to the Merger Consideration equal to the amount by which the Net Working Capital of the Company as of the close of business on the last calendar day of the month prior to the Closing Date is less than the Target Net Working Capital, and any such deficiency shall be paid to Buyer by the Significant Stockholders (the 'Net Working Capital Adjustment')" (emphasis added).

Section 2.4 (b) (iii) provides procedures for review and resolution of the adjustments. Section 2.1 (b) provides that the closing will take place "on the first business day of the month following the month in which all of the conditions set forth in Article VIII have been satisfied or waived."

Thus, the merger agreement provides that the Significant Stockholders would have to reimburse the buyer for any deficiencies between the predetermined Target Net Working Capital and the actual level of working capital "as of the close of business on the *last calendar day of the month prior* to the Closing Date" (emphasis added). Advent proposed this language on October 16, 2006, although now defendants contend this was a mistake because of confusion that a change in a different part of the merger agreement engendered. The agreement also contains clauses providing that it is the "entire agreement of the parties . . . and supersedes all prior agreements and undertakings, both written and oral" (section 11.7), and "may not be amended or modified except by an instrument in writing" signed by the parties (section 11.10).

---

1. A spreadsheet calculation of adjusted cash working capital shows the same figures used in section 2.4 (b) (i).

The closing took place on February 5, 2007. After making a bank loan adjustment that section 2.4 (a) required, and deducting $3.8 million that the buyers paid to satisfy RSN's outstanding bank loan and certain closing costs of sellers, the remaining adjusted merger consideration was $463,260. Of the total net consideration, $433,737 was payable to defendants as Significant Stockholders.

On February 16, 2007, RSN provided Advent with a closing date working capital schedule. The schedule showed adjusted working capital of $962,761 as of January 31, 2007. RSN asserted that the amount due to RSN from the Significant Stockholders as a net working capital adjustment was $474,298. As the merger agreement called for, RSN calculated the working capital adjustment by comparing the actual net working capital as of the close of the last day of business of the month prior to the closing date, January 2007 ($962,761), to the Target Net Working Capital for a closing occurring in the month of February ($1,437,059) (section 2.4 [b] [i]). When Advent refused to pay, plaintiffs commenced this action. The motion court granted summary judgment to plaintiffs and enforced the merger agreement according to its terms. Defendants appealed.

Defendants do not claim that the merger agreement is in any way ambiguous. Rather, defendants claim that they should not have to pay because the proposed reduction in consideration under section 2.4 of the merger agreement is the result of mutual mistake. What the parties really intended, according to defendants, was to calculate the actual working capital using figures from the same month as the closing (February 2007), not the month prior to the closing as the merger agreement states (January 2007).

"In a case of mutual mistake, the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement" (Chimart Assoc. v Paul, 66 NY2d 570, 573 [1986]). The Court of Appeals has strongly cautioned, however, that allowing parol and oral evidence "obviously recreates the very danger against which the parol evidence rule and Statute of Frauds were supposed to protect—the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract" (id.). Therefore, there is a " 'heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties' " and a "correspondingly high order of evidence is required to overcome

that presumption" (*id.* at 574, quoting *George Backer Mgt. Corp. v Acme Quilting Co.*, 46 NY2d 211, 219 [1978]). Thus, "[t]he proponent of reformation must 'show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties' " (*Chimart Assoc.*, 66 NY2d at 574, quoting *George Backer Mgt. Corp.*, 46 NY2d at 219).

Here, defendants do not show what the parties really agreed to "in no uncertain terms." First and foremost, to have reformation based on mutual mistake, the mistake must be just that—mutual. Here, all defendants can point to is a unilateral mistake of Advent's. There is no showing that RSN misunderstood section 2.4 of the merger agreement, a provision that *defendants* (through Advent) drafted. Indeed, that RSN invoiced Advent shortly after the merger indicates that RSN was fully aware of the provision and its implications.

A unilateral mistake may give rise to reformation where the other party takes advantage of an error only it has noticed under circumstances constituting fraud (*see George Backer Mgt. Corp.*, 46 NY2d at 219). However, defendants expressly disavow this "unilateral mistake plus fraud" argument and therefore we will not consider it. Nor is this a case like *Nash v Kornblum* (12 NY2d 42 [1962]), where the agreement of the parties was ascertainable by reference to a single immutable fact (calculation of linear feet on subject property) that was the substance of the agreement (*see also Baby Togs v Harold Trimming Co.*, 67 AD2d 868 [1979] [reformation warranted for clear arithmetical miscalculation]).

■ What we have here is at most a unilateral mistake on the part of defendants. This is not enough to rewrite an agreement that is complete on its face, unambiguous and contains a merger clause that claims to supercede all prior agreements, particularly where, as here, the parties were sophisticated business entities represented by counsel (*Chimart Assoc.* at 571). Although defendants may not have expected this result, "[r]eformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of *both* parties" (*George Backer Mgt. Corp.*, 46 NY2d at 219 [emphasis added]). Accordingly, we affirm that part of the order of the motion court that awarded summary judgment to plaintiffs based on the terms of the merger agreement.

Defendants have also appealed from that part of the motion court's order holding that the merger agreement did not limit defendants' potential liability. Defendants argue that if we uphold the grant of summary judgment to RSN, section 10.4 (b) of the merger agreement limits their liability to an aggregate of $433,736.45, the amount they actually received under the agreement. Plaintiffs claim the merger agreement does not limit their entitlement to legal fees and expenses.

Section 10.4 of the merger agreement, entitled "Limitation on Liability for Losses," provides that the parties agree that their "respective Liability for *Indemnifiable Losses* under this Article X shall be limited" (emphasis added) and, specifically, that the "aggregate Liability of the Significant Stockholders under this Article X,[2] other than Indemnifiable Losses arising under Section 10.2 (a) (i) (C) or 10.2 (a) (i) (F), shall not exceed the amount actually received by the Significant Stockholders."

Section 10.2 (a) (i) contains a nonexclusive list of "Indemnifiable Losses," including losses arising out of such events as breach of warranty. That section also requires the Significant Stockholders to "indemnify, defend and hold harmless" RSN Acquisition and RSN against those losses. However, the immediately following section, section 10.2 (a) (ii), requires the Significant Stockholders to reimburse RSN for all fees, "including, *without limitation*, any and all reasonable Legal Expenses" related thereto (emphasis added).

■ By discussing legal expenses "without limitation" separate from "Indemnifiable Losses" in the preceding section, the parties clearly meant to exclude legal expenses from the category of "Indemnifiable Losses." Section 10.4 (b) only limits liability for "Indemnifiable Losses." Hence, by its own terms, section 10.4 (b) does not apply to section 10.2 (a) (ii) and consequently does not limit the payment of legal expenses. Therefore, we also affirm that part of the motion court's order that granted summary judgment to plaintiffs for reasonable legal expenses.

Accordingly, the order of the Supreme Court, New York County (Bernard J. Fried, J.), entered December 12, 2008, which granted plaintiffs' motion for summary judgment in the amount of $474,298, plus interest and attorneys' fees in an amount to be determined, should be affirmed, without costs.

SAXE, J.P. (dissenting). I would reverse and deny plaintiffs' motion for summary judgment.

---

2. Article X is entitled "Indemnification; Expenses."

Although there is a heavy presumption that the contract between these sophisticated parties represented by counsel manifests their true intent (*see Chimart Assoc. v Paul*, 66 NY2d 570, 573-574 [1986]), defendants submitted sufficient evidence to overcome that presumption and raise an issue of fact as to whether reformation is warranted.

As the majority points out, it is often said that in the absence of fraud, the mistake shown " 'must be one made by both parties to the agreement so that the intentions of neither are expressed in it' " (*Amend v Hurley*, 293 NY 587, 595 [1944], quoting *Salomon v North Br. & Mercantile Ins. Co. of N.Y.*, 215 NY 214, 219 [1915]; *see Strong v Reeves*, 280 App Div 301 [1952], *affd* 306 NY 666 [1953]). However, the Court of Appeals has described a type of circumstance in which one party makes an inadvertent mistake in the nature of a scrivener's error when preparing the writing, so that in some material respect it does not reflect the terms of the parties' agreement, and the other party, "with knowledge of the mistake, [tries] to take advantage of the error" (*Nash v Kornblum*, 12 NY2d 42, 47 [1962]). Although such circumstances technically establish neither mutual mistake nor fraud, "equity will conform the written instrument to the parol agreement which it was intended to embody" (*id.* at 47, quoting *Pitcher v Hennessey*, 48 NY 415, 423 [1872]). As the Court in *Nash* explained, " 'Where there is no mistake about the agreement and the only mistake alleged is in the reduction of the agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected.' (*Born v. Schrenkeisen*, 110 N. Y. 55, 59.)" (12 NY2d at 47, quoting *Hart v Blabey*, 287 NY 257, 262 [1942].)

Defendants submitted convincing evidence that the merger agreement did not embody the parties' actual agreement that the adjustment would be computed by comparing the companies' actual working capital at the end of the month in which all conditions for closing were satisfied with the projected working capital for that same month, not the succeeding month. Defendants presented a detailed history of the parties' negotiations, a series of draft agreements showing the parties' clear mutual agreement that the working capital adjustment would be derived from a comparison between actual and target working capital figures for the same month, and the testimony of their attorney that, in attempting to incorporate a negotiated change concerning the timing of the closing, he made the drafting error that resulted in a deviation from the agreement

concerning the adjustment. Plaintiffs submitted no evidence controverting defendants' showing that the parties reached agreement about the method of computing the adjustment and that the change in the method of computation made by defendants' attorney was not the result of a negotiated change. Plaintiffs' suggestion that they recognized and accepted the change assuming it was made intentionally by defendants' attorney—although it was obviously detrimental to defendants—does not defeat defendants' equitable claim for reformation but merely raises an issue of fact.

SWEENY and RICHTER, JJ., concur with MOSKOWITZ, J.; SAXE, J.P., and ACOSTA, J., dissent in a separate opinion by SAXE, J.P.

Order, Supreme Court, New York County, entered December 12, 2008, affirmed, without costs.